UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| KER'SEAN OLAJUWA RAMEY, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 6:13-CV-43 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING RAMEY'S PETITION FOR A WRIT OF HABEAS CORPUS

Ker'sean Olajuwa Ramey, a Texas inmate incarcerated under a capital conviction and death sentence, filed a federal petition for a writ of habeas corpus on November 13, 2013. (Dkt. No. 7). Ramey alleges that constitutional error infected his trial with unfairness. Having considered Ramey's claims, the state court record, the pleadings, the evidence, and the applicable law, the Court now finds that Ramey is not entitled to federal habeas relief for the reasons provided herein.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 17, 2005, the State of Texas indicted Ramey for the offense of capital murder in the 24th Judicial District Court of Jackson County Texas. The four-count indictment charged Ramey for his role in the murders of Sam Roberts, Tiffany Peacock, and Celso Lopez. After a change of venue, Ramey stood trial in Victoria County, Texas.

The State based its case against Ramey on testimony from those to whom he admitted involvement in the murders, as well as his co-defendant LeJames Norman's

account of the crime.  On direct appeal, the Texas Court of Criminal Appeals summarized the trial testimony:

> The bodies of Celso Lopez, Tiffany Peacock, and Sam Roberts were found in Roberts's residence by his parents on August 25, 2005. Lopez had been shot four times: once in the cheek and three times in the back of the head. Peacock was shot twice in the head. Roberts was shot five times: once in the chest, once in the neck, and three times in the back of the head. They had been killed on or about August 24.
>
> Stacy Johnson, [Ramey's] former girlfriend, testified that he called her at 12:29 a.m. and 12:59 a.m. on August 25. He went to her house after their conversation, and slept there until shortly before 6 a.m. She said that he seemed "distant."

Two days later, Johnson accompanied [Ramey] to his house where he dug up "something" from his backyard. Johnson drove him to a dam. While Johnson was driving, [Ramey] called his former step-father, Lonny Lyte. (Both Johnson and Lyte testified about this conversation.) [Ramey] asked Lyte, "If you was to kill somebody, what would you do with the guns?" Lyte responded by saying that he would throw them in the river.

When they reached the dam, Johnson saw [Ramey] throw two pistols into the water. She later returned to the dam with the police and pointed out to the dive team the place where she remembered him throwing the pistols. They were found in the approximate location she indicated.

After he threw the pistols in the water, [Ramey] admitted to Johnson that he had committed a murder. He first said, "You know what this is about," to which she responded in the affirmative. When they returned to her house, he admitted to everything in detail, and he threatened to kill her if she told anyone.

A firearms examiner from the Department of Public Safety testified that markings on the bullets that were recovered from the victims' bodies were consistent with the bullets having been fired from the pistols that were recovered from the water at the dam.

The pistols had been stolen from [the Nairn family] residence on August 19, 2005. The owner of the pistols identified them, and one of the pistols was further identified by records of registration. Gerald Manzanalez and Christopher Times testified that, on August 19, they and [Ramey] had broken into a residence where they stole the pistols and some other firearms.

LeJames Norman testified that, on August 24, he and [Ramey] had gone to the scene of the murders, Sam Roberts's residence. Their objective was to steal 100 kilograms of cocaine they believed to be inside.

He said that he and [Ramey] prepared by stealing masks from a discount store. The jury saw the store's surveillance videotape which showed them stealing the masks at 9:22 p.m. on August 24.

Norman testified that they also prepared by wrapping tape around their shoes so as not to leave a trail. They donned their masks and cocked their guns before entering the house. They knocked on the door. Celso Lopez answered, and the two men forced their way inside. Norman held a gun on Lopez, while [Ramey] ran to the rear of the home, where he hoped to find

the cocaine. As [Ramey] searched for the drugs, Norman accidentally shot Lopez in the cheek. [Ramey] quickly returned to the front room and forced Lopez, bleeding and begging for help, to move to a bedroom and lie on the floor.

At that point Roberts came home, accompanied by Peacock (his girlfriend). When she saw what was happening, Peacock panicked and tried to run away. Norman grabbed her and forced her to her knees inside the house, near the front door. As she was bending down, he shot her in the back of the head. Seeing his girlfriend fall limp to the floor, Roberts attacked Norman. The two men "tussled" in the kitchen until [Ramey] shot Roberts, freeing Norman who immediately shot Roberts several more times while he lay on the floor. [Ramey] then returned to the bedroom and shot Lopez in the back of the head as he lay on the floor.

[Ramey] and Norman left the house. As they walked away, Norman realized that he had left his police scanner inside the house. [Ramey] quickly returned to retrieve the scanner. While inside, he shot the victims several more times to ensure that they were dead.

[Ramey] and Norman did not find any cocaine.

Eight other witnesses testified that [Ramey] had admitted to them that he had participated in the murders.

*Ramey v. State*, 2009 WL 335276, at *3-5 (Tex. Crim. App. 2009).

The defense rested without calling any guilt/innocence witnesses or presenting any evidence.[1] The jury instructions authorized Ramey's conviction: (1) for "caus[ing] the death of Sam Roberts and/or Tiffan[y] Peacock and/or Celso Lopez by shooting them with a firearm" in the course of a robbery or burglary or (2) for assisting Norman in the murders under Texas' law of parties.[2] Clerk's Record at 172-73. The jury found Ramey

---

[1]     Ramey retained Joseph R. Willie II to represent him at trial. Willie is also a licenced dentist and the record often refers to him as Dr. Willie. James D. Evans III served as second chair counsel. Unless necessary to identify one attorney, the Court will refer to Ramey's defense attorneys collectively as "trial counsel."

[2]     Texas' law-of-parties allows for a defendant's conviction "if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." TEX. PENAL CODE § 7.02(a)(2).

guilty of capital murder. The verdict form specified that the jury found Ramey guilty as the principal actor in the crime. Clerk's Record at 175.

A Texas jury decides a capital defendant's sentence by answering special-issue questions. In this case, the special issues asked: (1) will the defendant be a future danger to society; and (2) do sufficient circumstances mitigate against a death sentence? *See* TEX. CRIM.CODE art. 37.071 § 2(b); Clerk's Record at 193-94. The State based its punishment-phase case on Ramey's escalating violent actions. The State presented testimony and evidence that, when Ramey stood trial at age twenty-one, he had already amassed a significant criminal history. Ramey began acting out in school at a young age. His first interaction with the legal system occurred when at age sixteen he coerced a seven-year-old boy into performing oral sex on him. Originally charged with aggravated sexual assault, the charge was reduced to assault and the court sentenced him to juvenile probation for one year.

At age seventeen, Ramey pleaded guilty to criminal mischief for breaking into a vending machine at his high school. Less than six months later, Ramey and another friend, broke into his alternative learning school and ransacked the principal's office. His probation for the two offenses was eventually revoked for failing to pay fees, perform his community service hours, and report to his probation officer. Ramey's subsequent stay in the county jail did not squelch his lawlessness.

Jurors found out that Ramey had actually burglarized the Nairn residence three times. The State also presented evidence that, after burglarizing a different location, Ramey attempted to run over the homeowner with his car. Witnesses testified that

Ramey had planned other burglaries. Additionally, Ramey told friends that he had carried out various crimes for which he was never charged. Importantly, Ramey bragged that he had committed other murders.

Ramey's behavior did not improve while incarcerated before trial. He armed himself with weapons, created disturbances, and threatened guards.

The State's final witness was Dr. Richard Coons, a psychologist. Dr. Coons did not examine Ramey, but his review of relevant records led him to opine that an offender like Ramey would "commit criminal acts of violence in the future which would constitute a continuing threat to society." Tr. Vol. 38 at 81.

The defense only called two witnesses in the penalty phase. Ramey's mother, Ms. Terral Stevens, provided an overview of Ramey's life. Ms. Stevens told jurors of Ramey's early emotional and mental problems, including a diagnosis of dyslexia and ADHD at age four. Early evaluations revealed emotional disturbances and a lack of social skills. Ramey told evaluators that his step-father had abused him. Ramey's mother, however, failed to seek the necessary help for her son's problems.

Dr. Mark Kunick, a psychiatrist, based his testimony on an interview with Ramey and Ramey's mother, his review of records, and his understanding of the facts of the case. Dr. Kunick opined that Ramey's nonviolence since incarceration, his close-knit family, and his lack of mental illness would make it unlikely that Ramey would be a future danger.

The jury answered Texas' special issues in a manner requiring the imposition of a death sentence.

Trial counsel represented Ramey on direct appeal. On February 11, 2009, the Texas Court of Criminal Appeals affirmed Ramey's conviction and sentence in an unpublished opinion. *Ramey v. State*, No. AP-75,678, 2009 WL 335276 (Tex. Crim. App. 2009).

During the pendency of his state appeal, Ramey filed a state application for a writ of habeas corpus. The same judge who presided over Ramey's trial adjudicated his state habeas application. After the submission of proposed factual findings and legal conclusions, the trial-level court entered an order recommending that the Texas Court of Criminal Appeals deny habeas relief. State Habeas Record at 145-61. The Court of Criminal Appeals filed Ramey's case and set it for submission. *Ex parte Ramey*, No. AP-76,533, 2011 WL 1288284, at *1 (Tex. Crim. App. 2011). After additional briefing by the parties, the Court of Criminal Appeals entered an order denying relief on November 7, 2012. *Ex parte Ramey*, 382 S.W.3d 396, 398 (Tex. Crim. App. 2012). The Court of Criminal Appeals issued a mandate on December 4, 2012.

On November 14, 2013, Ramey filed a skeletal federal petition for a writ of habeas corpus raising five claims. Ramey, however, did not provide any extensive legal or factual discussion of the issues raised by his petition. Instead, Ramey provided the following brief list of claims:

1. The State violated Ramey's constitutional rights by failing to disclose favorable evidence.

2. Ramey is innocent of capital murder.

3. Trial counsel provided ineffective representation in the guilt/innocence phase of trial.

4. Trial counsel provided ineffective representation in the penalty phase of trial.

(Dkt. No. 7). Ramey also informed the Court that he "incorporates into his claims for relief the claims filed in his direct appeal brief and in his state habeas application . . . ." (Dkt. No. 7 at 4, n.1).

Ramey's attorneys believed that they had filed their petition outside the Anti-Terrorism and Effective Death Penalty Act's ("AEDPA") limitations period. The Court appointed new counsel to represent Ramey throughout federal review. (Dkt. No. 11). Ramey amended his habeas petition on December 15, 2015. Ramey's amended petition raised eleven claims:

1. The State violated Ramey's right to equal protection by systematically excluding jurors based on their race.

2. Trial counsel provided ineffective representation during jury selection.

3. Ramey was denied a trial by an impartial jury when a juror was excluded for expressing reservations about the death penalty.

4. The State violated Ramey's rights by knowingly presenting false testimony.

5. The State deliberately elicited information from Ramey in violation of *Massiah v. United States*, 377 U.S. 201 (1964).

6. Trial counsel provided ineffective assistance during pre-trial investigation and in the guilt phase.

7. Trial counsel provided ineffective representation in the penalty phase.

8. The cumulative effect of counsel's errors violated Ramey's constitutional rights.

9. The admission of unreliable testimony by an expert witness violated Ramey's rights.

10. Appellate counsel was constitutionally inadequate.

11. Ineffective assistance of trial, appellate, and state habeas counsel forgive the default of any procedurally deficient claims.

Respondent moves for summary judgment. (Dkt. No. 40). Respondent argues that (1) Ramey's skeletal petition was not timely; (2) any new claims in his amended petition are also not timely; (3) Ramey presents several claims in a procedurally inadequate manner; and (4) all claims lack merit. Ramey has filed a reply. (Dkt. No. 49). This matter is ripe for adjudication. Before turning to Ramey's habeas claims, the Court must determine whether he filed his initial petition in a timely manner.

## TIMELINESS OF RAMEY'S PETITION
## AND ISSUES AVAILABLE FOR FEDERAL REVIEW

All federal habeas corpus petitions filed after April 24, 1996, are subject to a one-year limitations period. The Court must first decide whether Ramey filed his skeletal petition in a timely manner. The Court will then decide whether any claims first raised in Ramey's amended petition are timely.

## I. Timeliness of the Skeletal Petition

The AEDPA "enacted a one-year period of limitation for federal habeas proceedings that runs, unless tolled, from the date on which the petitioner's conviction became final at the conclusion of direct review . . . ." *Cantu-Tzin v. Johnson*, 162 F.3d

295, 298 (5th Cir. 1998). Ramey's conviction became final when the Supreme Court denied his petition for certiorari from direct appeal on October 5, 2009.[3]

A "pending" application for state post-conviction relief tolls the one-year limitations period. 28 U.S.C. § 2244(d)(2). State post-conviction habeas proceedings in capital cases run concurrently to the direct appeal. *See* TEX. CODE CRIM. PRO. art. 11.071, § 4(a). Ramey filed a state habeas application during the pendency of direct appeal. The Texas Court of Criminal Appeals set his case for submission and eventually denied state habeas relief on November 7, 2012.

The Court of Criminal Appeals does not issue a mandate in every habeas case. A mandate only issues in cases where the matter is "set for submission" by the Court of Criminal Appeals. The Court of Criminal Appeals issued the mandate on December 4, 2012.

In the standard state habeas case, no mandate issues and a decision by the Texas Court of Criminal Appeal ends state habeas review. *See Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (stating that a habeas "application becomes final after a decision by the state's high court"). The specific question before the Court is whether, in a capital case set for submission, the Court of Criminal Appeals decision or its mandate is a final judgment that ends state review. The answer turns on whether the habeas action is "pending" under section 2244(d)(2) between the issuance of the appellate court's decision and its mandate. Because Ramey filed his initial federal petition on November

---

[3]     The Court emphasizes that the issue in this case involves "interpreting the AEDPA's tolling provision, § 2244(d)(2), not its triggering provision, § 2244(d)(1)." *Gonzalez v. Thaler*, 623 F.3d 222, 225 (5th Cir. 2010). The discussion that follows above does not relate on when a conviction is "final" under 28 U.S.C. § 2244(d)(1).

14, 2013, his pleading was timely only if state habeas review was tolled until the mandate issued.

The federal courts have not rendered a one-size-fits-all standard for when a state habeas case is no longer "pending," but rather look to the "state post-conviction procedures to determine . . . when state review ended . . . ." *Watts v. Brewer*, 416 F. App'x 425, 428 (5th Cir. 2011) (quotation omitted); *see also Carey v. Saffold*, 536 U.S. 214, 219 (2002) (refusing to establish a "uniform national rule" governing when a habeas case is pending). The Supreme Court has loosely said that a case is pending until "the state courts have finally resolved an application for state postconviction relief" which generally is when, "[a]fter the State's highest court has issued its mandate or denied review, no other state avenues for relief remain open." *Lawrence v. Florida*, 549 U.S. 327, 332 (2007); *see also Saffold*, 536 U.S. at 220.[4] The Supreme Court has instructed to look at "[w]hen the state courts have issued a *final judgment* on a state application" to decide if "it is no longer pending." *Lawrence*, 549 U.S. at 334 (emphasis added).

The Fifth Circuit has not yet decided when a Texas habeas case stops "pending" after being set for submission.[5] Respondent argues that, without exception, a state habeas action concludes and tolling ends when the Court of Criminal Appeals issues its decision denying relief. Respondent cites cases for the proposition that "[t]he Fifth Circuit has plainly stated that a Texas habeas 'application becomes final after a decision by the

---

[4] The Supreme Court has looked to the dictionary use of the word pending: "The dictionary defines 'pending' (when used as an adjective) as 'in continuance' or 'not yet decided.' It similarly defines the term (when used as a preposition) as 'through the period of continuance . . . of,' 'until the . . . completion of.'" *Saffold*, 536 U.S. at 220 (quoting Webster's Third New International Dictionary 1669 (1993)).

[5] The Fifth Circuit has held that a habeas case in Mississippi is pending until the mandate issues. *Watts v. Brewer*, 416 F. App'x 425, 430 (5th Cir. 2011).

state's high court.'" (Dkt. No. 54 at 3 (quoting *Ott*, 192 F.3d at 513). While true as far as it goes, the Fifth Circuit's language is limited because the federal courts in those cases did not face the unique issue before this Court – no mandate had issued because the state courts did not set the cited cases for submission.

Respondent also argues that "the mandate in Texas habeas procedure serves no real function affecting the state or federal habeas process." (Dkt. No. 54 at 7). Respondent argues that the federal courts should not consider that state habeas review remains pending "for what is simply a ministerial act: issuing the mandate." (Dkt. No. 54 at 3). The Court of Criminal Appeals has refused to characterize the mandate as merely "ministerial." *Ex parte Webb*, 270 S.W.3d 108, 111 (Tex. Crim. App. 2008). Instead, Texas treats a mandate as "an appellate court's official notice, directed to the court below, advising it of the appellate court's decision and directing it to have the appellate court's judgment duly recognized, obeyed, and executed." *Id*. at 9 n.2. The Texas courts do not intend the mandate to be a mere formality, but an indication that "the judgment was final." *Hartfield v. Thaler*, 403 S.W.3d 234, 239 (Tex. Crim. App. 2013); *see also Brown v. Thaler*, 455 F. App'x 401, 406 (5th Cir. 2011) (stating that "Texas law is unambiguous" that collateral review is final when the mandate issues).

The Texas legislature has structured capital habeas procedure in a manner that presupposes that the mandate is the point of final resolution for cases set for submission. For example, the convicting court may usually set an execution date when "the court of criminal appeals denies relief." Tex Code Crim. Pro. art. 43.141(a)(1). If the case is "filed and set for submission," however, statutory law prohibits the lower court from

setting an execution date until "the court of criminal appeals issues a mandate." TEX. CODE CRIM. PRO. art. 43.141(a)(2). Similarly, the mandate serves as the defining point at which jurisdiction can transfer from the state to the federal courts. The Texas statutes recognize that, in a case set for submission, inmates should not avail themselves of federal jurisdiction until the mandate issues. *See* TEX. CODE CRIM. PRO. art. 11.071(2)(e).

Both of those statutes cited above presuppose that Texas considers a case pending until the mandate has issued.[6] In fact, the Court of Criminal Appeals itself has said in a different context that "[a] cause is pending until mandate is issued from this Court." *Cuellar v. State*, 521 S.W.2d 277, 280 (Tex. Crim. App. 1975) (direct appeal); *see also Stevenson v. State*, 499 S.W.3d 842, 849 (Tex. Crim. App. 2016) ("[A] conviction with a pending appeal is not final until the appellate court affirms the conviction and issues its mandate.").

With that understanding of state law, the Court holds that, in a capital habeas case set for submission, a case is pending for the purposes of section 2244(2) until the Texas Court of Criminal Appeals issues an mandate. The Court emphasizes that this holding is limited to *capital* habeas cases *set for submission* and does not apply to traditional habeas actions.

---

[6]    Respondent correctly observes that Texas law does not permit the filing of a motion for rehearing or other similar pleading after the habeas court issues a decision. TEX. R. APP. P. Rule 79.2(d). The Fifth Circuit has held, however, that filing a motion for reconsideration tolls the limitations period. *Lookingbill v. Cockrell*, 293 F.3d 256, 261 (5th Cir. 2002); *Emerson v. Johnson*, 243 F.3d 931, 934 (5th Cir. 2001). The decision of the Court of Criminal Appeals cannot be the unwaivering point of finality if a disallowed subsequent motion for reconsideration tolls the federal limitations period.

Here, the Court of Criminal Appeals set Ramey's case for submission and, after rendering a decision, issued a mandate on December 4, 2012. Ramey filed his skeletal petition within a year afterward. Ramey's skeletal habeas petition was timely.

## II.     Timely Claims in Amended Petition

Even though Ramey's initial petition was timely, he raised new claims in his amended petition. Respondent argues that only claims four, six, and seven were included in the skeletal petition. Respondent says that the Court cannot reach the remaining claims in Ramey's amended petition because they do not "relate back" to his initial arguments.

Under Rule 15(c)(1)(B), Federal Rules of Civil Procedure, an amended pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." The Supreme Court has construed this provision narrowly when applied to federal habeas corpus cases. Only those claims in an amended petition filed after the AEDPA deadline that are tied to "a common core of operative facts" will relate back to the original petition and will be considered timely filed. *Mayle v. Felix*, 545 U.S. 644, 664 (2005). Habeas claims do not relate back "when [they] assert[] a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id*. at 650.

As previously noted, Respondent concedes that claims four, six, and seven relate back to the skeletal petition. The remaining claims fall into two categories. First, the amended petition contains several claims that Ramey did not raise in state court or in his

skeletal petition.  Specifically, Ramey did not exhaust portions of claim two and all of claims five, eight, ten, and eleven in state court.  Those claims do not share a common core of operative facts with the skeletal petition.  Ramey did not file them in a timely manner.

Second, Ramey's amended petition contains some claims that he exhausted in state court (part of claim two and claims one, three, and nine).  Ramey's initial petition mentioned in a footnote that he intended to "incorporate[ ]into his claims for relief the claims filed in his direct appeal brief and in his state habeas application . . . ."  (Dkt. No. 7 at 4, n.1).  The most generous reading of Ramey's petition allows for federal review of those claims.

Claims one, two, three, four, six, seven, and nine are timely.

## III.  Equitable Tolling of Claims That Do Not Relate Back

Claims five, eight, ten, and eleven do not relate back to his initial petition.  The Court can only reach the merits of those claims if Ramey can show equitable tolling forgives a strict application of the AEDPA limitations period.  "Equitable tolling is permissible only in 'rare and exceptional circumstances.'"  *United States v. Wynn*, 292 F.3d 226, 230 (5th Cir. 2002) (quoting *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998)).  "To obtain the benefit of equitable tolling, [an inmate] must establish that (1) he pursued habeas relief with 'reasonable diligence', and (2) some 'extraordinary circumstances' stood in his way and 'prevented' timely filing."  *Palacios v. Stephens*, 723 F.3d 600, 604 (5th Cir. 2013) (quoting *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir. 2012)); *see also Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v.*

*DiGuglielmo*, 544 U.S. 408, 418 (2005)).  Both criteria must be satisfied, and a petitioner seeking application of the doctrine bears the burden of showing that it should apply to him.  *See Lawrence*, 549 U.S. at 336.

Ramey argues that his initial federal attorneys' representation should allow equitable tolling of the limitations period.  "[P]rofessional misconduct" by an attorney may constitute an extraordinary circumstance warranting equitable tolling if the misconduct is not a "garden variety claim of excusable neglect," but rather is such that it is "egregious behavior" equivalent to abandonment.  *See Holland*, 560 U.S. at 649-53; *see also Maples v. Thomas*, 565 U.S. 266, 283 (2012).

 The Court has reviewed Ramey's extensive evidence and argument about the representation of his initial set of federal habeas attorneys.[7]  To summarize, the federal attorneys originally concluded that a federal petition was due on November 7, 2013.  As that date neared, Ramey claims that they abandoned him.  The evidence, however, shows that they became confused and assumed that the AEDPA deadline would include any time from which Ramey could have sought Supreme Court review of his state habeas action.  *See Lawrence*, 549 U.S. at 332 (holding that the time to file a certiorari petition from state habeas review does not toll the limitations period).  When the attorneys realized their mistake, they acted quickly and a skeletal petition was filed.  The initial attorneys also moved to withdraw.  The skeletal petition that was filed, however, did not include all the claims Ramey's new attorneys later put in the amended petition.

---

[7]    The Court observes that Ramey lost months of the limitations period because federal habeas resource counsel sought to secure representation without filing a federal motion for the appointment of counsel (as required by state law).  Ramey does not argue that the delay in filing a federal motion should toll the limitations period.

Despite Ramey's arguments, he has not shown that his federal attorneys left him effectively without counsel. They incorrectly assessed the filing date. Simply miscalculating a deadline is not grounds for equitable tolling. *See Maples*, 565 U.S. at 282; *Holland*, 560 U.S. at 651-52; *Lawrence*, 549 U.S. at 336. The record otherwise shows that the initial attorneys made efforts to meet with their client, research the record, and develop a federal petition consistent on a timeline based on their miscalculation. At best, this is a case of garden variety negligence or error, not abandonment.

Importantly, Ramey's arguments do not explain why anything but negligence accounts for the fact that his attorneys did not include his new claims in the skeletal petition. The omission of those claims is not "egregious" or "extraordinary" conduct that would equitably toll the limitations period. *Holland*, 560 U.S. at 649-50. After considering all of Ramey's argument and evidence, the Court finds that he has not shown a basis for equitable tolling. Claims five, eight, ten, and eleven are time barred.

## STANDARD OF REVIEW

The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). How an inmate litigates his claims determines the course of federal habeas adjudication. The exhaustion doctrine precludes federal consideration of any claim raised for the first time in federal court. *See* 28 U.S.C. § 2254(b)(1).[8] As a corollary to exhaustion, the procedural-bar doctrine requires inmates

---

[8] Ramey asks the Court to stay this case to raise any unexhausted claim in state court. Ramey has not shown that a stay is proper under *Rhines v. Weber*, 544 U.S. 269 (2005), or that an avenue for state review is open to him.

to litigate their claims in compliance with state procedural law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review. Under AEDPA's rigorous requirements, an inmate may only secure relief after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2).

Inmates arguing legal error in state court decisions must comply with § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). A petitioner does not merit relief by merely showing legal error in the state court's decision. *See White v. Woodall*, ___ U.S. ___, 134 S. Ct. 1697, 1702 (2014) (stating being "merely wrong" or in "clear error" will not suffice for federal relief under AEDPA). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 134 S. Ct. at 1702 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

Federal courts presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Court of Criminal Appeals summarily denied habeas relief on all but one claim. In evaluating Ramey's claims under AEDPA, the federal courts will "look through" the "summary denial of [Ramey's state habeas application] and evaluate the state trial court's reasoned decision." *Brumfield v. Cain*, ___ U.S. ___, 135 S. Ct. 2269, 2276 (2015) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991)). As the same judge presided over the trial proceedings and the state habeas action in this case, the presumption of correctness for state habeas factual findings is especially strong. *See Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014); *Woods v.*

*Thaler*, 399 F. App'x. 884, 891 (5th Cir. 2010); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).[9]

An inmate's compliance with 28 U.S.C. § 2254(d) does not guarantee habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (observing that no Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively"). A habeas petitioner meeting his AEDPA burden must still comply with weighty jurisprudential tenets, as the non-retroactivity principle of *Teague v. Lane*, 489 U.S. 288 (1989) that prevents habeas courts from creating new constitutional law.

## ANALYSIS

### I. The State Violated Ramey's Right to Equal Protection by Systematically Excluding Jurors Based on Their Race. (Claim One)

Ramey's first claim alleges that the prosecutor systematically excluded African-Americans from serving on his jury. The jury selection process in this case involved the questioning of individual jurors from two jury panels. The 135-member initial venire dire contained seven African-American individuals. Five of those potential jurors were dismissed for cause, and two were excused because they were distant relatives of Ramey. The parties did not select any African-American jurors from the first panel. When the trial court called a second panel, eight jurors were already seated. Of the forty-nine member second panel, six were African-American.

---

[9]     Section 2254(e)(2) authorizes evidentiary hearings under narrow conditions. No evidentiary hearing is necessary to adjudicate Ramey's petition.

When members of the second panel assembled in the courtroom, four African-American potential jurors sat toward the front of the courtroom.  The prosecutor requested a jury shuffle,[10] which left only two African-American prospective jurors among those who would eventually be questioned before the jury was selected.  After the jury shuffle, African-American veniremember Cheryl Steadham-Scott was the second juror questioned.  The State removed Ms. Steadham-Scott by peremptory strike.  The next juror questioned was also African-American but she was dismissed for cause.

No African-American jurors served at trial.  Ramey contends that the State systematically excluded jurors based on their race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

Under *Batson*, the prosecution violates the equal protection clause by striking potential jurors based on race.  *Batson* jurisprudence has established a three-step burden shifting scheme to ascertain the State's intent when striking members of a protected category:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.  Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding

---

[10] Texas provides that either party, based solely upon visual inspection of the venire, may request the court to shuffle or randomly reseat the entire panel.  *See* TEX. CODE CRIM. PRO. art. 35.11.  Both the State and the defendant have the absolute right to one jury shuffle.  *Smith v. State*, 648 S.W.2d 695, 696 (Tex. Crim. App. 1983).

racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotations and citations omitted); *see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005) (*Miller-El II*).

While Ramey contends that racism permeated jury selection, he only points to one African-American prospective juror, Ms. Steadham-Scott, against whom the State used a peremptory strike. Ramey challenged her strike in the appellate and habeas proceedings. On appeal, Ramey claimed that the trial court did not properly engage in the *Batson* procedure and that the prosecution shuffled the jury for racial purposes. Ramey's habeas application faulted the State for not coming forward with a sufficient race-neutral explanation for striking Ms. Steadham-Scott.

Ramey raises a robust *Batson* claim in federal court. Ramey contends that he can show purposeful discrimination in the State's exercise of peremptory strikes. Relying primarily on inferences, Ramey (1) disputes the State's reason for striking Ms. Steadham-Scott; (2) argues that the prosecution used a jury shuffle to lessen the chance of receiving an African-American juror; (3) points to a purported history of discrimination in Jackson County criminal trials; and (4) asserts that the State questioned the African-American jurors differently. Ramey, however, only gave the state courts an opportunity to consider the first two arguments.

## A.    The Questioning of Ms. Steadham-Scott

The prosecution used a peremptory strike against one black potential juror, Ms. Steadham-Scott.   After extensive questioning, the prosecution concluded by asking her whether she could, as required by the future-dangerousness special issue, impose a death sentence when "the only evidence was that it would be slightly more likely than not" that "he will be dangerous in the future."  Tr. Vol. 29 at 77-78.  Ms. Steadham-Scott said that she would "need much more of a burden."  Tr. Vol. 29 at 78.  The State then passed her.

Trial counsel began the defense's question by "go[ing] over this last issue" with her.  Tr. Vol. 29 at 78.  At that point, the prosecutor interrupted and said that he "was not going to challenge [Ms. Steadham-Scott ] for cause."  Tr. Vol. 29 at 78.  Trial counsel then passed her without asking any additional questions.  Tr. Vol. 29 at 79.

The prosecutor subsequently exercised a peremptory challenge against Ms. Steadham-Scott without explanation.   Tr. Vol. 29 at 79.   The defense did not raise a *Batson* objection then, but asked for the trial court to include her questionnaire in the record.  The trial court excused her.

Three weeks later, and after the jury had been selected but not yet sworn in, trial counsel told the court:

> just for a housekeeping matter, when we were doing the voir dire on the jury and the supplemental panel, juror number two, which is Cheryl Steadham-Scott, was peremptorily struck by the prosecution and we were just wanting to note that the prosecution did not give any race neutral explanations for that . . . .

Tr. Vol. 30 at 9.[11]  The prosecutor then said:

> it was my understanding that if I would have continued to pursue the line of questioning, that juror would most likely been challengeable for cause, but I didn't do it because her questionnaire clearly indicated that she could not impose the death penalty and there were many other racially neutral reasons and, if the Court wants, I can try to go back and resurrect those notes.

Tr. Vol. 30 at 10.  In short, the prosecution provided two race-neutral reasons: (1) continuing the last line of questioning would have shown her to be challengeable for cause and (2) she was not strong on the death penalty.  The trial court said that it "was comfortable with the record reflecting what it did with respect to that juror" and the defense did not make any further objection.  Tr. Vol. 30 at 10.

Because the prosecutor explained the peremptory strike of Ms. Steadham-Scott by providing reasons that were not inherently discriminatory, the state courts found that this process sufficiently complied with required *Batson* procedure.[12]  Ramey now argues that the prosecutor's explanation was a pretext for purposeful discrimination.

---

[11]     Ramey made his observation only minutes before the jury was sworn.  Tr. Vol. 30 at 12.  Under Texas law, a *Batson* challenge is not timely if made after the jury is selected and sworn.  *See* TEX. CODE CRIM. PRO. art. 35.261(a); *Hill v. State*, 827 S.W.2d 860, 864 (Tex. Crim. App. 1992).  As explained by the Court of Criminal Appeals, "[d]uring the discussion which followed, the State declared that it was unprepared for a *Batson* motion since one was never requested, but claimed that Steadham-Scott's answers to the prosecutor's questions as well as her juror questionnaire led to racially-neutral reasons for a peremptory strike, such as her ambivalence regarding inflicting the death penalty."  *Ramey*, 2009 WL 335276, at *3.

[12]     The state habeas court, presided over by the same judge who oversaw the trial, made the following factual findings relating to Ms. Steadham-Scott's individual voir dire:

> [T]he petitioner voiced no objection and raised no issue as to whether or not the State improperly exercised a peremptory challenge. Twenty-one days after this prospective juror was peremptorily struck by the prosecutor petitioners attorney pointed out that at the time of the exercise of this peremptory challenge the prosecution did not give a race-neutral explanation for the challenge and petitioner wanted that for the record. Since no objection was made at the time of the challenge of this prospective juror and no *Batson* claim had been made the State did not have its notes and was not prepared to address the race-neutral reasons for the strike because of the delay. However the court recalled that there were issues which the State went into in the examination of this prospective juror which would give rise to a peremptory strike and was comfortable with the record showing that the strike was made for those purposes and not based upon any racial reason.

This Court's review "turns on factual determinations, and, in the absence of exceptional circumstances, [courts] defer to state court factual findings unless we conclude that they are clearly erroneous." *Synder*, 552 U.S. at 477 (quotation omitted). Ramey assumes that, because of racial bias, the prosecutor framed his questioning in a way to disqualify Steadham-Scott from service. The state courts, however, found that Ms. Steadham-Scott "was repeatedly unable to answer the State's questions regarding her ability to adjudge the death penalty, both in her jury questionnaire and during voir dire":

> When asked whether she understood the death penalty or whether she would change it, she replied, "Yea. I don't know how I would change it, but – I don't know how I would change it." When asked if she believed in the death penalty, she responded, "I mean, you're asking me stuff like do I believe in the death penalty. I don't know if I believe in it, you know." On the jury questionnaire, she left blank the question, "Have you ever been opposed to the death penalty?" and responded in another section on the questionnaire that she was "not opposed or . . . in favor of it."

*Ramey*, 2009 WL 335276, at *3.

The state habeas court also found that "Steadham-Scott's standing on the death penalty was very questionable and the peremptory challenge by the State was based upon her inconclusive opinions on the death penalty and not upon her do identity as an African-American." State Habeas Record at 152. On that basis, the state habeas court found that "the use of the State's peremptory challenge was not based on racial motivations." State Habeas Record at 152.[13] In fact, the state habeas court commented

---

State Habeas Record at 152. Ramey does not renew his state habeas challenge that the trial court did not sufficiently perform the required *Batson* inquiry.

[13] As the Court of Criminal Appeals observed on direct review, the "there was a brief allusion to race in the jury questionnaire and then on [Ms. Steadham-Scott's] individual voir dire . . . ." *Ramey*, 2009 WL 335276, at *3.

that there was a "complete failure to show that there was any basis for a claim that the challenge was racially motivated." State Habeas Record at 152.

This is not a case where jury selection involved a definitive pattern of the prosecution striking black jurors. Of the nine African-Americans identified on the jury panels, six were dismissed for cause and two because they were relatives of Ramey. The record does not demonstrate a stark disparity in the percentage of blacks peremptorily struck as opposed to whites. The prosecutor provided race-neutral reasons for striking Ms. Steadham-Smith.

On their face, the State's reasons for dismissing Ms. Steadham-Smith are race neutral. *See Hernandez*, 500 U.S. at 360. First, questioning immediately before the peremptory strike raised serious concerns about Ms. Steadham-Smith's ability to impose the correct burden on the future-dangerousness issue. *See Muniz v. State*, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993) (requiring the State only to prove that the defendant "would, more likely than not, commit violent criminal acts in the future"). Second, some of Ms. Steadham-Scott's answers supported the prosecutor's belief that "she could not impose the death penalty": she did not know if she believed in the death penalty, she was ambivalent toward capital punishment, and was neither opposed to or in favor of it. Tr. Vol. 29 at 64-66. She also did not answer questions such as whether she had previously been opposed to the death penalty. Tr. Vol. 29 at 66. While elsewhere she said that she

---

Ramey argues that the prosecutor asked questions about capital punishment and then "abruptly shifted course and began asking her about her experience as an African American." (Dkt. No. 30 at 45). In reality, the prosecutor was reviewing Ms. Steadham-Scott's jury questionnaire and, moving from the pages talking about capital punishment, came to the section where she had answered that she had "feelings about African Americans being treated fairly." Tr. Vol. 29 at 69. The prosecution then engaged her in questioning that allowed her to explain her answer, particularly because she specified that she "[ran] into issues like that all the time at work." Tr. Vol. 29 at 69-70.

would "have to be fair and open" about reaching a decision, Tr. Vol. 29 at 65, the record reasonably supports the prosecution's belief that she would not be favorable to considering a death sentence.

Even though the record does not strongly question the State's motives here, courts may consider relevant facts and circumstantial evidence to assess possible discriminatory intent. Ramey relies on other inferences to prove that the State engaged in purposeful discrimination: the use of a jury shuffle, an alleged history of discrimination in Jackson County, and disparate questioning.

### B.     The Jury Shuffle

Ramey argues that the State's use of the jury shuffle shows that it intended to keep African-Americans off the jury. A jury shuffle may suggest discrimination. *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Miller-El II*, 545 U.S. at 254-55. Ramey argues that the State used a jury shuffle on the second panel because "most of the African American veniremembers were seated towards the front of the panel." (Dkt. No. 30 at 52).

Ramey argued to the state courts that the jury shuffle itself amounted to a *Batson* violation. Trial counsel asked for a race-neutral explanation when the prosecutor requested a jury shuffle. While Ramey did not make a classic *Batson* challenge, the trial court nonetheless required the prosecution to explain why it had asked for a jury shuffle. The prosecutor told the court:

> I have individuals here in Victoria who have assisted me in going through
> the list and given me information about the prospective jurors . . . . I have
> gotten that information from a number of different individuals. And in

> doing that I looked at this list and the overwhelming majority of the folks
> that they had suggested would be good State's jurors were towards the back
> of the panel. And so in light of that I requested a shuffle . . . . I will tell the
> Court as an officer of the Court that those individuals, probably 75–80
> percent of the ones they had told me would be good State's jurors were
> towards the back. And so that's why I asked for a shuffle.

Tr. Vol. 21 at 20. The defense did not make any other argument, and the trial court recessed without making an express ruling.

The Court of Criminal Appeals found that the trial counsel "implicitly denied [Ramey] relief" on his jury selection complaint which means that it believed that "[t]he explanation proffered by the State" was "sufficiently race-neutral." *Ramey*, 2009 WL 335276, at *2. Ramey has not shown clear and convincing evidence to rebut the state court's finding that the State did not use the jury shuffle for racial reasons. *See Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

### C.    History of Exclusion and Comparative Juror Analysis

For the first time in federal court, Ramey also asks the Court to consider other factors to show that the State exercised its peremptory strike against Ms. Steadham-Scott on the basis of race. Ramey particularly emphasizes historical discrimination in Jackson County and disparate questioning of African-American potential jurors by the prosecutor. Ramey's failure to raise these issues previously deprived the state courts from the opportunity to consider his arguments.

In arguing that prosecutors in Jackson county have historically excluded African-American jurors, Ramey relies heavily on *Hernandez v. State*, 347 U.S. 475 (1954), a

case in which the Supreme Court found that had been a systematic exclusion from jury service in Jackson County. Ramey also says "[u]pon information and belief, the racial discrimination present in this case is not an isolated incident and [the District Attorney] has employed similar discriminatory tactics throughout his tenure . . . ." (Dkt. No. 30 at 57). Ramey, however, has not provided any evidence of a systematic racism in jury selection by the prosecutor's office in recent years. Ramey's reliance on case from more than sixty years ago and his bare supposition about current racism cannot overcome the deference paid to state court adjudications.

Without any other basis to support his *Batson* claim, Ramey tries to show "a comparative analysis of the jurors – that is, 'side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *United States v. Minor*, 698 F. App'x 765, 768 (5th Cir. 2017) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("*Miller-El II*")). If the government's explanation "for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241.

Ramey has not identified any jurors from his trial who, like Ms. Steadham-Smith, displayed difficulty with imposing the burden for the future-dangerousness issue. Instead, Ramey's argument tries to show that the prosecution treated African-American jurors differently during questioning about the death penalty. In particular, Ramey points to two white jurors, Marjorie Jean and Carol Laza, who were selected to serve despite leaving some answers blank on their questionnaire and expressing that they did not

understand the death penalty.  (Dkt. No. 30 at 44-45).  Despite some similarities in how they answered the jury questionnaire, questioning of both Jurors Jean and Laza confirmed that they would be able to return a death sentence.  Tr. Vol. 29 at 90-120; Tr.  29 at 150-58.  Even after questioning, Ms. Steadham-Smith could not say that she believed in capital punishment. Tr. Vol. 29 at 64-66.  Ramey has not identified jurors who gave such ambivalent responses during questioning. Although he attempts to point out discrepancies in the State's questioning, his arguments about disparate questioning are not compelling. Ramey has simply not shown that the prosecutor's proffered reason for striking Ms. Steadham-Smith "applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, [thus] . . . tending to prove purposeful discrimination."  *Miller-El II*, 545 U.S. at 241.

### D.    Conclusion of the *Batson* Claim

This Court's role is "to determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary."  *Miller-El I*, 537 U.S. at 341. State court review centered on the integrity of the prosecutor's reason for striking Ms. Steadham-Scott, and to a lesser extent whether the jury shuffle showed racism.  With the record and argument in state court, significant and binding state factual findings found no impropriety in the prosecutor's peremptory removal of jurors, and particularly the peremptory strike against Ms. Steadham-Scott.

Ramey's more extensive briefing on federal review does not make a stronger case of purposeful discrimination by the State.  Taken as a whole, Ramey has not made a

persuasive argument that the State struck Ms. Steadham-Scott, or otherwise treated potential jurors differently, because of race. Ramey has not provided clear and convincing evidence that the state court factfindings were incorrect, 28 U.S.C. § 2254(e)(1), nor shown that its decision was unreasonable, 28 U.S.C. § 2254(d)(2). *See Davis v. Ayala*, ___ U.S. ___, 135 S. Ct. 2187, 2199 (2015) (emphasizing AEDPA's impact on *Batson* claims).

## II. Trial Counsel Provided Ineffective Representation During Jury Selection. (Claim Two)

In his second claim, Ramey argues that trial counsel provided deficient representation during jury selection in four ways. First, Ramey claims that trial counsel did not ask potential jurors the right questions. Second, Ramey argues that his attorneys should not have agreed to dismiss many venire members without questioning. Third, Ramey claims that trial counsel ineffectively questioned one specific potential juror. Finally, Ramey argued that trial counsel did not object when the State misstated the law. Respondent argues that Ramey did not exhaust the third argument in state court.

### A. *Strickland* Standard

Courts evaluate an attorney's efforts under the standard from *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

A court's review "of counsel's performance must be highly deferential," and made without "the distorting effects of hindsight." *Id*. at 689. Courts assess counsel's "challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because otherwise "[i]t is all too tempting for a defendant to second-guess counsel's assistance . . . ." *Id*. The law honors an attorney's "conscious and informed decision on trial tactics and strategy," allowing for federal relief only when "it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). The prejudice element requires the movant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The state courts rejected many of Ramey's *Strickland* claims. While "[s]urmounting *Strickland*'s high bar is never an easy task," a habeas petitioner's duty to "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and § 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citation omitted); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

## B.     Questioning about Bias

Ramey argues that trial counsel "(1) failed to ask life-qualifying questions and assert cause challenges for jurors who demonstrated obvious bias and inability to follow

the law, and (2) failed to rehabilitate and agreed to excuse jurors who expressed a reservation to the death penalty, without any voir dire." (Dkt. No. 30 at 66). Despite making general allegations about deficiencies during voir dire, Ramey only provides briefing on the questioning of four jurors (Craig Ullmann, Jose Loredo, Sharon Reynolds, and Nancy Wind).

Respondent contends that much of Ramey's second claim involves "nitpicking" of trial counsel's questioning. (Dkt. No. 40 at 121). Ramey challenged trial counsel's voir dire questioning on state habeas review. The state habeas court found that his arguments "are simply based upon tactics expressed with generality and with no specific allegation of specific conduct which constituted ineffective assistance of counsel. In regard to these claims the court finds that the record simply does not support [Ramey's] allegations of ineffective assistance of counsel." State Habeas Record at 155.

While "[v]oir dire plays a critical function in assuring the criminal defendant that his constitutional right to an impartial jury will be honored," *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (quotation omitted), "no hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling v. United States*, 561 U.S. 358, 362 (2010). Not every attorney will conduct voir dire in the same manner. The mere fact that another attorney might have asked different questions will not support a finding of ineffective assistance. *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013) ("Moreover, Garza cites no authority, and we have found none, that would require a defense attorney to ask specific questions at voir dire."). Indeed, a defense attorney's method of voir dire is strategic, and thus it "cannot be the basis for a claim of ineffective assistance of counsel

unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995) (quotation omitted). Further, a petitioner "alleging deficient performance during jury selection must identify any particular juror who was in fact prejudiced and must establish that had counsel's questioning focused on a specific area of bias, the bias would have been found." *Villanueva v. Stephens*, 555 F. App'x 300, 306 (5th Cir. 2014). This Court's review will center on whether additional questioning by counsel would have made the four jurors subject to removal by cause.

> 1. Ullman

Ramey argues that two jurors (Ullman and Loredo) were biased because they would "automatically impose" a death sentence. (Dkt. No. 30 at 67). The prosecution engaged Ullman in wide-ranging questioning. When the prosecutor passed Ullman, trial counsel only asked for clarification on his jury questionnaire response that he was "in favor in [sic] capital punishment except in a few cases where it may not be appropriate." Tr. Vol. 9 at 213. Ullman said: "I would say that that would play towards the circumstances involved around the case. How could I be more specific? Cases where the person may have been legally insane or not mentally capable of knowing what they were doing." Tr. Vol. 9 at 213. Afterwards, trial counsel told the trial court that "after consultation with the client, . . . the Defense accepts this juror." Tr. Vol. 9 at 214.

Ramey faults trial counsel for not asking Ullman more questions. Ramey, however, does not acknowledge the State's earlier questioning that explored Ullman's opinions and ability to serve as a juror in a capital case. Ullman said that he would

consider all of the evidence before deciding whether a death sentence was appropriate. Tr. Vol. 9 at 183. His answers showed that he understood the presumption of innocence and reasonable-doubt standard. Tr. Vol. 9 at 191-95 Nothing in Ullman's questioning by the State would give rise to a challenge for cause.

2.    Loredo

Trial counsel engaged Juror Loredo in much longer questioning. A full review of the defense questioning, however, shows that he was not necessarily an unfavorable juror. Pursuant to trial counsel's questions, Loredo said he was "conservative" on some issues and "liberal on some issues" such as being "pro choice." Tr. Vol. 17 at 68. Loredo explained that he had a friend accused of a killing and the thought of being a witness in that case made him worry that he could not deal with being the one whose testimony "is what actually sends him to prison." Tr. Vol. 17 at 71. Loredo told trial counsel that, on a scale of one to ten with one being against capital punishment and ten being positively in favor of it, he was a "seven." Tr. Vol. 17 at 76.

Ramey emphasizes an answer in which Loredo said he would "favor" the death penalty. Tr. Vol. 17 at 80. Even when Loredo said he "favored" the death penalty, he clarified that he only meant that he "believed in it" and his opinion on the death penalty would not affect his ability to consider the evidence. Tr. Vol. 17 at 80. Loredo, in fact, expressed a willingness to impose a life sentence "if a single mitigating factor were presented to [him]." Tr. Vol. 17 at 81. Given the exhaustive questioning by the defense, Ramey's emphasis on one answer misrepresents trial counsel's efforts and mischaracterizes the juror's ability to be impartial.

### 3. Reynolds

Similarly, Ramey picks out some elements from Juror Reynolds' questioning that he says made her biased toward law enforcement. For instance, Juror Reynolds said that her favorite television program was "Law & Order" and that she worked as a 911 dispatcher. Juror Reynold's discussion about her favorite television program did not reveal any pro-prosecution bias. Tr. Vol. 13 at 103. Trial counsel's questioning, also, revealed that her experiences through her employment would help her "be a fair juror to both sides, you know, to listen to all that is said and see that everything that's being said." Tr. Vol. 13 at 100-01.[14]

Ramey somewhat misconstrues Ms. Reynolds' answers to questions about the death penalty. For instance, he criticizes trial counsel for not striking for her "pro death penalty ideation" based on a statement that "inmates are on death row for too long," but does not quote her actual statement which reflected compassion for the inmates: "it's, I would think, a very hard place to be, never knowing . . . how long you're going to be there or . . . if you're going to make it to your actual execution date . . . for being in the system. You hear of . . . people not actually making it to the execution date, you know. You live with that stuff every day." Tr. Vol. 13 at 99. Ms. Reynolds signaled compassion that a reasonable attorney could see as helping the defense. Ms. Reynolds'

---

[14] Ramey relies on a post-judgment affidavit from Ms. Reynolds in which she expresses surprise at her selection as a juror. Respondent argues that the Court cannot consider the affidavit under Rule 606(b) of the Federal Rules of Evidence which specifically limits the admissibility of juror testimony during an inquiry into the validity of a verdict. Here, however, the affidavit does not expressly fall within Rule 606(b)'s prohibition because it relates to voir dire, not the juror's statements, impressions, or reaction to outside factors directly impacting the "validity of a verdict." *See Austin v. Davis*, 647 F. App'x 477, 493 (5th Cir. 2016); *see also Hatten v. Quarterman*, 570 F.3d 595, 602-03 (5th Cir. 2009). The affidavit, however, is not useful because Ms. Reynolds does not express any actual bias.

jury questionnaire showed that she was "right in the middle" and able "to consider all the choices, albeit life or death, and let the facts of the case and the facts of the defendant decide it." Tr. Vol. 13 at 69. Ramey has not shown that counsel needed to ask any additional questions of Ms. Reynolds about the death penalty.

4. Wind

Finally, Ramey contends that Juror Wind could not be impartial because of knowing information about the case. Juror Wind said she had close ties with Edna, Texas, the location of the murders. She read things in the paper about the case. She had discussed the murders with others. Tr. Vol. 24 at 36. Trial counsel did not ask Juror Wind if she had any bias, likely because Juror Wind had already told the prosecutor that her true knowledge of the murders was spotty and that she had not formed an opinion about the case. Tr. Vol. 24 at 33-34. Ramey has not shown that a reasonable attorney should have asked her more questions.

In the end, Ramey has not shown that any of the challenged jurors harbored views that would have resulted in dismissal for cause. As the state habeas court found, Ramey's complaint "simply reveals claims that [his] trial counsel did not conduct the voir dire in a manner in which [his] present counsel would conduct voir dire. . . . [A]ll of these claims are simply based upon tactics . . . ." State Habeas Record at 155. Ramey has not shown that trial counsel provided deficient performance, or that actual prejudice resulted, from the questions he asked on voir dire.

### C.    Agreement to Excuse by Consent

The parties agreed to dismiss thirty-nine veniremembers based on their answers to the written juror questionnaire, without any individual voir dire.[15]  Without identifying which jurors he refers to, Ramey contends that "[a]t least 15 of those prospective jurors who were 'excused by agreement' were clearly not challengeable for cause based on their answers to the questionnaire."  (Dkt. No. 30 at 75).  Ramey contends that trial counsel's failure to require adequate questioning of those jurors violated his rights.

No authority requires all potential jurors to be questioned.  Texas law allows excusal by the consent of parties.  *See* TEX. CODE CRIM. PRO. art. 35.05. Here, Ramey does not allege that the summary excusals were based on race or any impermissible factor other than individual feelings about the death penalty. Ramey does not specify which potential jurors were removed by consent, but could have been rehabilitated with additional questioning.  Even if trial counsel agreed to remove all jurors unequivocally opposed to or in favor of a death sentence, such an approach falls within an area reserved traditionally for strategic decision making.  *See Teague*, 60 F.3d at 1172.  Ramey has not shown *Strickland* deficient performance or prejudice with regard to this claim.

---

[15]    It does not appear that Ramey exhausted this portion of his claim in state court.  Respondent, however, does not move for dismissal of the claim on that basis.

### D.   Dismissal of Mary Natividad

Ramey argues that trial counsel allowed potential juror Mary Natividad to be excused without any voir dire.  The parties agreed to dismiss Ms. Natividad based only on her questionnaire showing general opposition to the death penalty.  Tr. Vol. 16 at 21. When the State observed that Ms. Natividad answered that "she not only has been opposed to the death penalty now, but she has been opposed in the past," trial counsel responded, "[a]s much as I would like for her to be here, she is really on absolutes."  Tr. Vol. 16 at 21.

Because Ramey did not exhaust this portion of his claim in state court, it is procedurally barred.  The Court, however, alternatively finds that Ramey's briefing on this matter does not strongly show deficient performance or prejudice in trial counsel's choice to allow dismissal of Ms. Natividad.  Trial counsel could tactically agree to her excusal for various reasons, none of which would questionably result from deficient legal performance.  Ramey has not shown that he can overcome the procedural bar or that this argument merits relief.

### E.   The Prosecutor's Alleged Misstatements of Law

Finally, Ramey contends that trial counsel provided deficient performance by not objecting when the prosecutor misstated the law.[16]  The prosecutor repeatedly told jurors that the mitigation special issue was the only opportunity to give mitigating evidence any effect.  Under Texas law, however, a jury can consider and give effect to some mitigating

---

[16]      Again, it is not clear that Ramey exhausted this portion of his claim.  Respondent, however, does not ask for dismissal on exhaustion grounds.

evidence through the future dangerousness special issue. *See Scheanette v. Quarterman*, 482 F.3d 815, 826 n.64 (5th Cir. 2007) (listing several categories of evidence that jurors can consider under the future-dangerousness issue). Ramey has shown that trial counsel probably missed a viable objection and an opportunity to provide jurors a correct understanding of the law.

Even if the prosecution misstated the law, a great deal of time had passed and much had happened before the jury deliberated Ramey's punishment. The jury had heard significant evidence and argument in both phases of trial, making it unlikely they remembered the complained-of statements. The Court is "skeptical that, by the time their . . . deliberations began, the jurors would have remembered the explanations given during voir dire, much less taken them as a binding statement of the law." *Penry v. Johnson*, 532 U.S. 782, 801 (2001).

Jurors had a full ability to give effect his evidence under the mitigation special issue which ameliorated any harm from the prosecutor's misstatement. At any rate, before deliberations began, the trial court correctly instructed jurors on how to consider the evidence in answering the special issues. Because courts presume that juries will follow their instructions, *see Zafiro v. United States*, 506 U.S. 534, 540 (1993); *Richardson v. Marsh*, 481 U.S. 200, 209 (1987), the jury charge cured any error during voir dire. *See Styron v. Johnson*, 262 F.3d 438, 454 (5th Cir. 2001) (finding that, despite prosecutor's misstatement of the law during voir dire, there was no constitutional error because the court properly instructed the jury in accordance with law). Given the significant amount of time, evidence, and testimony that the jury had to consider after

hearing the prosecutor's statements, and in light of the correct jury instructions, "[t]he comments of . . . counsel during voir dire were surely a distant and convoluted memory by the time the jurors began their deliberations on . . . [Ramey's] sentence." *Penry*, 532 U.S. at 802. Ramey has not shown *Strickland* error with regard to this portion of claim two.

In sum, Ramey has not shown any constitutional error with regard to claim two, much less that the state court's adjudication of his claim was unreasonable.

## III. Juror Excluded for Expressing Reservations about the Death Penalty. (Claim Three)

Ramey contends that his constitutional rights were violated "because veniremember Laurilyn F. Warren was excluded from the jury simply because she expressed reservations about the death penalty." (Dkt. No. 30 at 80). Exclusion of prospective jurors "hesitant in their ability to sentence a defendant to death" without any limitations violates the Fourth and Fourteenth Amendments. *Morgan v. Illinois*, 504 U.S. 719, 732 (1992); *see also Adams v. Texas*, 448 U.S. 38, 45 (1980); *Witherspoon v. Illinois*, 391 U.S. 510, 521-22 (1968). The State must demonstrate through questioning that the potential juror it seeks to exclude lacks impartiality, and the judge must then determine whether the state's challenge is proper. *See Wainwright v. Witt*, 469 U.S. 412, 423 (1985). The key issue is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424 (quoting *Adams*, 448 U.S. at 45). The state habeas court issued explicit factual findings relating to Ms. Warren's dismissal. This Court can grant federal habeas

relief only if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997).

While Ramey contends that Ms. Warren was dismissed "simply for expressing a reservation about the death penalty" (Dkt. No. 30 at 80), the record reveals her concerns about the death penalty were not the only, or even most important, reason the trial court removed her for cause. At the beginning of her questioning, Ms. Warren said that she was "definitely more opposed" to the death penalty than for it. Tr. Vol. 22 at 279, 290. In subsequent questioning she said "depending on the circumstances [she] could vote for a death penalty." Tr. Vol. 22 at 291. "[B]ecause of [her] answers to the opposition to the death penalty," the prosecution then engaged Ms. Warren in questions about her ability to consider the evidence under the beyond-a-reasonable-doubt standard. Ms. Warren subsequently provided waffling opinions about how she would consider evidence in a capital case.

Ms. Warren told the prosecutor that she would hold the State to a higher standard in a death case. Tr. Vol. 22 at 299. After trial counsel's questioning rehabilitated her, Tr. Vol. 22 at 301, Ms. Warren again said she would require a "greater quantum of proof" in a capital case than another criminal action. Tr. Vol. 22 at 309. Trial counsel's subsequent questioning extracted that Ms. Warren "hope[d] that she could follow what the Judge tells her to do" regarding the reasonable-doubt standard. Tr. Vol. 22 at 310.

The prosecution then challenged Ms. Warren for cause:

| | |
|---|---|
| The State: | Now this is the classic vacillating juror. She has vacillated but she has clearly stated on at least two if not three occasions that she would require a greater burden of proof than beyond a reasonable doubt which she would establish, and based on that the State would challenge for cause. |
| Trial counsel: | Your Honor, I think in all due respect I think that the prosecution tried to testify for the witness. The witness said she could follow the standards. This is not one that's challengeable for cause, and if they want to exercise a peremptory strike that's fine, but this one's not challengeable for cause. This juror says she can follow the law. |
| The Court: | Well, just in the interest of time if – would the State want to proceed with more examination of the witness? |
| The State: | Oh, absolutely, Judge |
| The Court: | Yeah. |
| The State: | There's many other issues that I don't think she would be able to – I think she would probably fall on, but whatever. |
| The Court: | All right. The challenge is granted. |

Tr. Vol. 22 at 310–311.

Here, Ramey contends that the trial court dismissed Warren because of her opposition to the death penalty, but in reality her vacillation on the beyond-a-reasonable-doubt standard precluded her jury service. With regard to her dismissal on that ground, the state habeas court found no error because "she would impose a greater burden of proof upon the State in a capital murder case than in other cases." State Habeas Record at 148. Even though "upon questioning by [Ramey's] trial counsel she testified she would follow the law and the evidence," after "further questioning by the State the

venireperson again stated she would require a greater burden of proof in a death penalty case." State Habeas Record at 148. The state habeas court found that Warren "was the classic vacillating juror and the State's challenge for cause was granted because she had a bias against a rule of law the State was entitled to rely upon in the trial of this cause." State Habeas Record at 148.

Here, the trial court could reasonably conclude that Warren would "frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following [her] oath[.]" *Witt*, 469 U.S. at 423. Ms. Warren went back-and-forth in her answers, yet the best she could say is that she "hope[d]" to apply the reasonable-doubt standard correctly. Tr. Vol. 20 at 309-10. As the trial court clearly could have been "left with the definite impression that [Ms. Warren] would be unable to faithfully and impartially apply the law," *Witt*, 469 U.S. at 426, the trial court had a reasonable basis for granting the State's challenge for cause. *See Drew v. Collins*, 964 F.2d 411, 417 (5th Cir. 1992) (finding no error in dismissing juror who on occasions indicated that he would hold the State to a higher burden of proof in a death case). The state habeas court's rejection of this claim was not an unreasonable determination of the facts. The Court will deny this claim.

## IV. Knowingly Presenting False Testimony and Suppressing Evidence. (Claim Four)

Ramey's fourth ground for relief raises three arguments: (1) the State presented false testimony through trial witnesses Otis Santellana and Gerald Manzanalez; (2) the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 82 (1963) relating

to plea deals, pending charges, prior statements, and plea agreements for numerous witnesses; and (3) the State violated Ramey's constitutional rights by delaying the signing of a witness' plea agreement until after trial. Ramey did not exhaust any of these arguments in state court. The unexhausted nature of these issues bars federal review unless Ramey can show cause and prejudice. *See Dretke v. Haley*, 541 U.S. 386, 393 (2004).

Ramey summarily argues that "[t]he State's misconduct, combined with the ineffectiveness of Dr. Willie for failing to conduct an adequate pretrial investigation and object to the testimony described below at trial, and the ineffectiveness of state appellate counsel and state habeas counsel for failing to later raise these issues, all serve as the 'cause and prejudice' of any potential procedural default." (Dkt. No. 30 at 88). In reality, Ramey for the most part bases his procedural arguments on the merits of his claims. Before turning to his arguments, and alternatively the merits, the Court makes the following observations about Ramey's cause-and-prejudice briefing.

First, ineffective assistance by his prior attorneys cannot forgive the procedural bar of these issues. Ramey alleges that all his prior attorneys were ineffective for not raising the barred claims, but does not provide specific briefing on how their efforts did not comply with the deficient performance and actual prejudice prongs in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Ramey has not shown that his prior attorneys can even serve as cause in this case. Appellate counsel cannot raise extra-record claims on direct appeal. *See Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004). The Supreme Court has said that ineffective assistance of habeas counsel can only

forgive *Strickland* claims involving trial counsel's representation. *See Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058 (2017). Ramey cannot show cause by blaming his prior attorneys for not raising these arguments.

Second, Ramey largely briefs the "cause" component without providing any briefing specifically addressing the "actual prejudice" requirement. In this circuit, "actual prejudice" requires the petitioner to "establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013); *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000). Ramey simply assumes that the merits of the claim justifies finding cause and prejudice. Ramey, however, does not provide specific briefing on actual prejudice.

The Court will review whether Ramey has otherwise overcome the procedural bar or, alternatively, whether this claim has merit.

### A.  False Testimony

Ramey argues that the prosecution presented false evidence at trial. In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court explained that the prohibition against false testimony is "implicit in any concept of ordered liberty." *See also Giglio v. United States*, 405 U.S. 150, 154 (1972). "In order to establish a *Napue* violation, the defendant must show (1) the statements in question are actually false; (2) the prosecution

knew that the statements were false; and (3) the statements were material." *United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998). Ramey argues that "[t]he State knowingly presented false testimony from several witnesses," (Dkt. No. 30 at 87), but only provides argument concerning witnesses Gerald Manzanalez and Otis Santellana.

1.    Manzanalez

Manzanalez testified that he helped Ramey and Christopher Times break into Kenneth Nairn's residence and steal firearms. After the murder, Ramey told Manzanalez that he threw two of the stolen pistols "off the dam." Tr. Vol. 31 at 31. The State used Manzanalez's testimony, along with that from Times, to tie Ramey to the murder weapons.

During his trial testimony, the prosecution asked Manzanalez if he had "any kind of deal, or anything worked out as far as you getting something for your testimony today?" Tr. Vol. 31 at 17. Manzanalez answered, "No." Tr. Vol. 31 at 17. Ramey argues that "Manzanalez was less than forthcoming" because "[d]uring a 2014 interview with Petitioner's investigator, Mr. Manzanalez stated that he was aware that the State had offered a lenient disposition of his pending burglary charges, in exchange for his testimony – before he testified at Mr. Ramey's trial." (Dkt. No. 30 at 90).

Ramey claims that the prosecution should have corrected Manzanalez's testimony. "The prosecution must . . . reveal the contents of plea agreements with key government witnesses." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). Ramey has developed evidence suggesting that Manzanalez had received a plea offer from the State, though he had not yet formalized

the deal. Manzanalez has provided an affidavit in which he says that the State made him a plea offer for the charges stemming from his involvement in the Nairn robbery. (Dkt. No. 30, Ex. 65). He was "sure that [he] knew" of the deal before testifying or, in his words, "I would not have testified against [Ramey] had I not understood that I would get a deal." (Dkt. No. 30, Ex. 65).

Ramey supports this argument with criminal history records showing that the State indicted Manzanalez for several charges before trial, but he pleaded guilty fifty-one days after trial with a recommendation if he agreed "to testify truthfully against co-defendants including . . . Ramey at any of Ramey's trials, including capital murder trial." (Dkt. No. 30, Ex. 62). Also, time records from Manzanalez's attorneys show they had engaged in plea negotiations six months before trial, though no contact with the prosecution resumed until Manzanalez pleaded guilty.

As an initial matter, Ramey has not shown cause or prejudice to overcome the procedural bar of this portion of his claim. Cause "constitut[es] something external to the petitioner, something that cannot fairly be attributed to him, that impeded compliance with the State's procedural rule." *Maples v. Thomas*, 565 U.S. 266, 293 (2012). Ramey contends that the State's misconduct, ostensibly in suppressing evidence of the plea deal, and ineffective representation by his former attorneys forgives his failure to raise this claim. (Dkt. No. 30 at 88). The record, however, does not contain any evidence that the State suppressed the information serving as a basis for this claim. A diligent investigation could have uncovered Manzanalez's plea agreement, his attorneys' time records, and, presumably, his testimony as recorded in his affidavit. The record does not

suggest that Ramey's prior attorneys could not have uncovered the material his current ones have discovered.

He has also not shown actual prejudice. Manzanalez's testimony was important to connect Ramey to the murder weapons. But it was not the only testimony that did so. Norman and Times likewise testified about the robbery of the Nairn residence that put the murder weapon in Ramey's possession.[17] Ramey told Bradford Butler that he stole guns from the Nairn residence. Other witnesses testified about Ramey's disposal of the weapon after the murders, including the individual who led the police to the weapon. And, importantly, Ramey repeatedly told other people about his involvement in the crime. Ramey has not shown that any failure to disclose the pending plea deal harmed the defense. Ramey's *Napue* claim relating to Manzanalez's testimony is procedurally barred.

Even if the Court could reach the merits of this issue, the Court would alternatively deny relief because Ramey has not shown that any false testimony from Manzanalez was material. Testimony is material if "in any reasonable likelihood [it could] have affected the judgment of the jury." *Giglio*, 405 U.S. at 154; *see also Wearry v. Cain*, ___ U.S. ___, 136 S.Ct. 1002, 1006 (2016). The evidence supporting Ramey's conviction was solid. Manzanalez provided incriminating details, but significant other testimony connected Ramey to the Nairn robbery and subsequent murders. Even if the existence of a deal may have allowed jurors to view Manzanalez's testimony with skepticism, trial counsel told jurors that Manzanalez's testimony "has no bearing on the

---

[17]     The prosecutor referred to Manzanalez and Times together in closing arguments. Tr. Vol. 35 at 27, 73-76.

guilt or innocence on Mr. Ramey as to whether or not he committed the offense of capital murder." Tr. Vol. 35 at 29. Any false testimony about Manzanalez's plea agreement was not material to trial.

>    2.    Santellana

Ramey also contends that Otis Santellana testified falsely. Santellana was incarcerated in a cell near Ramey before trial. Santellana testified that Ramey disclosed several details about the crime, including that Ramey shot one of the victims. Ramey argues that Santellana provided false testimony when he said that law enforcement officers did not ask him to talk to Ramey. Also, Ramey argues that the State fed Santellana details about the crime.

As an initial matter, Ramey has also not overcome the procedural bar of this issue. In addition to not showing any external impediment that would amount to cause, Ramey has not shown actual prejudice. Santellana was one of a parade of witnesses who described Ramey's incriminating admissions. Ramey told other witnesses, such as Stacey Johnson, about the murders in much greater detail than he did Santellana. Norman provided extensive testimony about Ramey's role in the killings. Ramey has not shown cause or actual prejudice to forgive the procedural bar of this portion of claim four.

The Court observes, alternatively, that Ramey does not support his arguments relating to Santellana with competent evidence. Ramey relies on two documents to support this claim. First, Ramey relies on a document allegedly containing Santellana's account of jailors instructing him to secure information about the murders from Ramey.

Ramey's federal habeas investigator apparently drafted the document as an affidavit, but Santellana would not sign it. (Dkt. No. 30, Ex. 69). While Ramey provides an affidavit from his investigator vouching for the contents of the document, the unsigned document still is not competent evidence.

Second, Ramey provides an affidavit from a jailor explaining events that happened soon after Ramey was incarcerated. The jailor saw Santellana, who had a reputation for being a "snitch," in a long meeting with other jailors. Afterwards, "it was obvious what was going on" because Santellana was heard asking Ramey questions about the murders. (Dkt. No. 30, Ex. 67). The jailor's affidavit, however, demonstrates that she lacks personal knowledge about any agreement. The jailor's statement that it was "completely obvious . . . that [Santellana] was asked to get certain information from Ramey during that meeting," shows that she bases her opinion in conjecture, not knowledge.

Ramey, therefore, provides no competent evidence to substantiate his claim that Santellana was an agent of the State when Ramey divulged details about the murder to him. Without anything more than his own speculation, Ramey cannot show cause or actual prejudice to overcome the procedural bar of this claim.

Alternatively, even considering his evidence, Ramey has failed to show that any falsity in Santellana's testimony was material. Ramey agues that "Santellana's testimony provided details that supported the State's theory of the case, and was one of the few coherent hearsay narratives." (Dkt. No. 30 at 93). Santellana's testimony was not the only, and far from the most detailed, account of the crime. Ramey confessed to other witnesses in jail. Ramey detailed various elements of his role in the crime to others

before his incarceration. And Norman provided a complete description of the killings. Even if he could show that the prosecution knowingly adduced false testimony from Santellana, Ramey has not shown that it was material.

## B. *Brady*

Ramey argues that the prosecution violated his due process rights by suppressing evidence. Specifically, Ramey argues that the prosecution suppressed: (1) prior criminal offenses committed by witnesses Christopher Times, Kevin Childs, Otis Santellana, Myron Hardaway, Jonathan Snyder, and LeJames Norman; (2) outstanding criminal charges against Childs; (3) a prior statement that Santellana gave to investigators but was turned over to the defense three days after his trial testimony; and (4) the fact that the prosecution coerced Norman into testifying against Ramey by threatening to prosecute his mother for aiding in his flight from prosecution.[18]

"There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the defendant must have been prejudiced." *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000). Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003); *see also Graves v. Cockrell*, 351 F.3d 143, 153–54 (5th Cir. 2003). "When evidence is equally available to both the defense and the prosecution, the defendant must

---

[18] Ramey also alleges that the prosecution suppressed the evidence discussed above. The Court's discussion relating to the false-evidence claim applies with equal force to any related *Brady* claim.

bear the responsibility for failing to conduct a diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

Ramey first contends that the State did not turn over information about various witnesses' prior criminal offenses and pending criminal charges. Ramey, however, does not have any affirmative proof that the prosecution withheld information about witnesses' prior crimes. Ramey has not secured any affidavit in which trial counsel expresses surprise at the witnesses' criminal convictions and other information that was not discussed at trial. Instead, Ramey says that he reviewed trial and habeas counsel's records and did not find any information about the criminal convictions.

The State had an open file policy in this case. Tr. Vol. 3 at 14. The State sent the defense a great deal of information, but also allowed the defense to visit and review the prosecutor's files. Tr. Vol. 4 at 4. Ramey has not shown that the prosecution kept information about criminal histories secret. Ramey's speculation does not give rise to a *Brady* claim.

Moreover, the criminal convictions and charges at issue were matters of public record. "*Brady* rights are not denied where the information was fully available to the defendant and his reason for not obtaining and presenting such information was his lack of reasonable diligence." *United States v. Dean*, 722 F.2d 92, 95 (5th Cir. 1983); *see also United States v. Infante*, 404 F.3d 376 387 (5th Cir. 2005) (holding no *Brady* violation occurs where the complained of evidence is a matter of public record, obtainable upon request). The fact that the witnesses were all currently jail inmates or had participated in criminal acts with Ramey would have alerted the defense to research their criminal

histories.[19]   The State, in fact, referred to some of the allegedly undisclosed offenses during the inmates' testimony.  Tr. Vol. 34 at 93, 143-44, 190.  For those reasons, Ramey has not shown a *Brady* violation regarding the witnesses' criminal records.

Next, Ramey argues that the police did not turn over a statement that Santellana gave until three days after his trial testimony.   Santellana gave the police voluntary statements on December 13 and December 15, 2005.  The defense had a copy of the second statement, but did not receive the first until after Santellana had been returned to TDCJ custody.   Ramey, however, has not shown that the failure to turn over the December 13, 2005 statement was material.   The parties discussed the issue and trial counsel said that, even though the defense did not have the statement, the prosecution had allowed the defense to review the notes an investigator had taken of the statement.  (Dkt. No. 30, Ex. 16 at 5).  Trial counsel also said:

> I have looked at that statement, and everything else. There are some discrepancies between the first and the second statement of which, if we decide that there's enough of a discrepancy, we will address it with the Court in a motion for new trial, if we feel that there is enough of a discrepancy. If there's not enough of a discrepancy, there will be no issue with it at all.

(Dkt. No. 30, Ex. 16 at 4-5).  Trial counsel did not file a motion for new trial or otherwise describe what discrepancies exist between Santellana's statements.

---

[19]     The record contains a defense exhibit labeled "trial witnesses" in which the defense noted that Norman and Childs were in jail.  Tr. Vol. 43, DX-4.  Hardaway testified that he was in prison for burglary of a habitation.  Tr. Vol. 34 at 190.  Snyder testified that he was in the Jackson County jail for a parole violation.  Santellana testified that he in TDCJ custody for escape, aggravated assault with a deadly weapon, and possession of a firearm by a felon.  Only Times was not currently incarcerated, but was under deferred adjudication for his role in the Nairn robbery.  Tr. Vol. 31 at 48.  Jurors could visibly see from their handcuffs and jail attire that the other witnesses had committed crimes, and further details about those crimes would have taken little away from what credibility they had.

Likewise, Ramey makes no effort to show what differences exist between Santellana's statement and the trial testimony. Indeed, the best Ramey can say is that "the suppressed statement may constitute impeachment evidence." (Dkt. No. 30 at 102). Ramey, however, provides no description of the alleged differences, much less briefing on how that would have affected the fairness of his trial. Ramey has not sufficiently briefed a *Brady* claim regarding Santellana's prior police statements.

Finally, Ramey argues that the prosecution should have divulged that fact that it coerced Norman into testifying against Ramey by threatening to prosecute his mother for aiding in his escape. During his flight before arrest, Norman's mother traveled to "the U.S. and Mexico border to get [Norman] to return to Edna, Texas." (Dkt. No. 30, Ex. 72). The district attorney later spoke with Norman's mother and, she recounts: "I may also have been told that I might be in trouble for my trip to the border." (Dkt. No. 30, Ex. 72). Norman's mother then avers:

> Soon after the meeting with [the prosecutor] Mr. Bell and those other people, I went to see my son LeJames in the Jackson County jail. LeJames *told me* that Bobby Bell *told him* that he was going to *put me*, his mama, in prison for 10 years for that trip to the border if LeJames didn't cooperate and testify in the capital cases that LeJames and Ker'Sean Ramey were charged with.

(Dkt. No. 30, Ex. 72) (emphasis added). Respondent points out that Norman's mother provides only a hearsay recitation of the purported reason for which Norman chose to testify. Such hearsay is an insufficient basis to craft a *Brady* claim.[20] In this case,

---

[20] In his own trial, Norman explained why he testified against Ramey. At no point in his testimony did he suggest that he felt any degree of coercion from the State to do so. *Norman v. Davis*, No. V-012-cv-54, DE 10, Tr. Vol. 95 at 108-163.

Norman's own testimony does not suggest that he testified from coercion, and the hearsay laden affidavit is insufficient to show that prosecutorial coercion forced his cooperation. Ramey has not shown cause and prejudice to overcome the procedural bar. Alternately, this claim lacks merit.

### C. Delayed Signing of Santellana's Plea Deal and the Confrontation Clause

Ramey finally argues that the State violated the Confrontation Clause when it "delayed the signing of Gerald Manzanalez's plea agreement until after [his] trial had concluded." (Dkt. No. 30 at 110). Ramey contends that not disclosing the proposed plea deal denied him the opportunity to cross-examine Manzanalez about its contents. This argument lacks a sturdy factual or legal foundation. Ramey builds this claim on an unproven factual premise, that the State intentionally halted Santellana's plea negotiations and then hid any information about them. The record instead suggests that Santellana had not yet agreed to the terms of that deal when he testified. Ramey also bases his argument on a false legal premise. Ramey concedes that "a plurality of the Supreme Court has opined that the Confrontation Clause does not extend to a state's nondisclosure of evidence before trial." (Dkt. No. 30 at 110, n.41); *see Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987). Federal habeas review is not the forum for the creation of new constitutional law. Ramey's proposed Confrontation Clause claim violates the

non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 301 (1989). Without a legal or factual foundation, Ramey's Confrontation Clause claim cannot overcome the procedural bar or command habeas relief.

### D. Conclusion

This Court's review of Ramey's unexhausted arguments shows that (1) he has not demonstrated cause and prejudice to overcome their procedural defects and (2) that they lack merit. The Court will deny Ramey's fourth ground for relief.

### V. Trial Counsel Provided Ineffective Assistance During Pre-trial Investigation and in the Guilt Phase. (Claim Six)

In a dense, meandering claim, Ramey faults numerous features of trial counsel's pre-trial investigation and guilt/innocence representation. Among arguments dealing with failures in the development and presentation of evidence and testimony, Ramey intersperses general criticism of his trial attorneys, and most particularly Willie. For instance, Ramey contends that Willie's schedule was overloaded and that he did not spend enough time developing Ramey's case. Federal law, however, does not require a specific quantum of hours before a capital investigation is constitutionally adequate. The Court's concern is on what counsel did not investigate, develop, or present, and how that would have made a difference.

Ramey's sixth claims centers on three areas. First, Ramey contends that trial counsel should have interviewed certain trial witnesses better, more-intensely challenged Norman's testimony, shown that the State deliberately used Santellana to secure information against him, and sought exclusion of Myron Hardaway's testimony. Second,

Ramey claims that trial counsel failed to use readily available impeachment evidence, particularly the criminal histories of witnesses Childs, Snyder, Times, Manzanalez, and Ceasar. Finally, Ramey argues that trial counsel should have relied on a ballistics expert to dispute the State's evidence against him.

### A. Procedural Default Law

Ramey did not exhaust the allegations from his sixth claim in state court. The Court of Criminal Appeals would apply its abuse-of-the-writ doctrine to keep Ramey from raising those issues in a successive state habeas application, thus resulting in a federal procedural bar. *See Coleman*, 501 U.S. at 736 n.1. The Court can forgive the procedural bar if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law . . . ." *Id*. at 750.

Ramey relies on *Martinez v. Ryan*, 566 U.S. 1 (2012), to argue that deficiencies in state habeas counsel's representation provide cause. A federal habeas petitioner relying on *Martinez* must make three important showings before the Court can consider the underlying defaulted *Strickland* claim. First, an inmate must show that "his claim of ineffective assistance of counsel at trial is substantial – *i.e.*, has some merit . . . ." *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016); s*ee also Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015).

Second, an inmate must "show that habeas counsel was ineffective" for not raising the underlying *Strickland* claim. *Garza*, 738 F.3d at 676. A court applies traditional *Strickland* jurisprudence and "indulge[s] a strong presumption that [habeas] counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*,

466 U.S. at 689. Courts recognize that habeas counsel "'who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000)). In order to prove ineffective assistance, the defendant must demonstrate that "'a particular nonfrivolous issue was clearly stronger than issues that counsel did present.'" *Vasquez*, 597 F. App'x at 780 (quoting *Robins*, 528 U.S. at 288).

Third, even after showing cause flowing from habeas counsel's representation, an inmate still must demonstrate "actual prejudice." *Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014); *see also Martinez*,132 S.Ct. at 1321 (remanding for an assessment of actual prejudice). The Fifth Circuit has held that, even after showing cause under *Martinez*, an inmate must show actual prejudice by "establish[ing] not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hernandez*, 537 F. App'x at 542; *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986); *United States v. Frady*, 456 U.S. 152, 170 (1982). At a minimum, actual prejudice requires an inmate to show a reasonable probability that he would have been granted state habeas relief had his habeas counsel's performance not been deficient. *See Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016)*; Newberry v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014).[21]

---

[21] This Court's analysis of the prejudice requirement would be the same if considered only under *Strickland*'s reasonable-probability-of-a-different-result standard.

This Court's review of Ramey's *Martinez* arguments, placed in the proper context of the prior proceedings, shows that he cannot overcome the procedural deficiencies.

### B.    Weaknesses in Ramey's Sixth Claim

Before turning to the question of habeas counsel's representation, the Court makes some observations about weaknesses in Ramey's federal claim.    Lacking physical evidence at the crime scene, Tr. Vol. 31 at 173, 178-82, the State relied heavily on the testimony of those involved in crimes with Ramey and those to whom he confessed.[22] Relying on affidavits and other evidence, Ramey's sixth claim intends to chip away at the credibility of various trial witnesses.    Ramey, however, overstates the effect his new evidence would have had.

For example, Ramey claims that counsel failed to interview witnesses Childs, Manzanalez, Snyder, DeLeon, Santellana, Times, and Myron Hardaway. Ramey claims that interviewing Childs would have shown that he "was coerced into giving a statement against Mr. Ramey." (Dkt. No. 30 at 143).  Childs' affidavit, however, does not provide any evidence of coercion.   Instead, Childs describes how during interviews after an escape attempt he "was told to let the sheriff deputies know if I heard anything from Ramey or Norman about the triple homicide," which he subjectively took as "they were saying that they had me on this escape, so I better cooperate."  (Dkt. No. 30, Ex. 64).

---

[22]       Ramey made incriminating statements to: Stacy Johnson, Tr. Vol. 31 at 192-197, 206-210; Bradford Butler, Tr. Vol. 34 at 490-544; Cortney Hardaway, Tr. Vol. 34 at 172-174, 184-187; Otis Santellana, Tr. Vol. 34 at 100-1076; Marvin Ceasar, Tr. Vol. 34 at 136-138; Jonathan Snyder, Tr. Vol. 34 at 145-147; Kevin Childs, Tr. Vol. 34 at 159-161; Myron Hardaway, Tr. Vol. 34 at 192-194; and Lonnie Lyte, Tr. Vol. 31 at 224-25.

Childs' subjective perception of what the police meant does not necessarily prove coercion.

Also, as discussed previously, Ramey has not provided competent evidence for some of his allegations. Ramey relies on hearsay allegations and unsworn affidavits to impeach testimony by Manzanalez, Santellana, and Times. Likewise, as previously discussed, if trial counsel called jailor DeLeon as a witness she could only say that it was her impression that Santellana had been told to get information from Ramey. (Dkt. No. 30, Ex. 67).

Ramey particularly emphasizes trial counsel's cross-examination of Norman, arguing he (1) failed to challenge Norman's testimony on the grounds that the State coerced him by threatening to prosecute his mother; (2) failed to cross-examine Norman about his long criminal record; and (3) failed to ask Norman about his violent escape from jail and his pending escape charges. The defense, however, extensively cross-examined Norman on other grounds, particularly his multiple statements to police and during the grand jury testimony which conflicted with trial testimony. Tr. Vol. 33 at 132–99, 211–12.

Some of the evidence only would have made a marginal difference at trial. Ramey faults trial counsel for not using the criminal histories from Childs, Snyder, Times, Manzanalez, and Ceasar to dispute their testimony. The jury knew that each of those men had committed crimes. With the exception of Times, who testified that he was on deferred adjudication, each of those men were in state custody at the time of trial.

Additional testimony about their crimes may not have undercut their testimony any more significantly than their obvious status as inmates.

Finally, Ramey does not verify all his allegations. For example, Ramey also faults trial counsel for not retaining an expert in ballistics. The State's expert could only say that the victims were shot by bullets sharing characteristics as those fired from the murder weapons, Tr. Vol. 33 at 97-126. Trial counsel, however, extensively cross-examined witnesses regarding issues relating to the weapons. Ramey has not shown what different conclusions an independent expert in ballistics would have reached. With extensive testimony linking Ramey to the weapons the police recovered, his various incriminating statements, and Norman's testimony, a reasonable attorney could choose not to employ a ballistics expert.

With that understanding, the Court looks at the evidence from trial which Ramey does not challenge in this claim.

### C. Evidence Unaffected by Ramey's Sixth Claim

This Court's inquiry into state habeas counsel's failure to raise the indicated *Strickland* claim assesses not just the evidence counsel did not present, but the whole of the incriminating evidence from trial. *See Sears v. Upton*, 561 U.S. 945, 954-55 (2010); *Trevino v. Davis*, 861 F.3d 545, 554 (5th Cir. 2017). Even taking Ramey's *Strickland* arguments into account, other witnesses whose testimony is unaffected by his federal claims provided testimony putting the events into a highly incriminating context. Without actually saying that he killed anyone, Ramey asked Lonny Lyte, "If you was to kill somebody, what would you do with the guns?" Tr. Vol. at 224-25. Lyte told him to

throw them in a river. Tr. Vol. 31 at 225. Jessica Castro said that Ramey called her on the night of the murders and asked her to make up and alibi for her. Tr. Vol. 34 at 22. Ramey also asked Courtney Hardaway to form an alibi for him. Tr. Vol. 34 at 169. Ramey's cousin Bradford Butler testified that he saw Ramey and Norman with the murder weapons on the night of the crime. Tr. Vol. 34 at 41-75.

Evidence unaffected by Ramey's habeas arguments show his involvement in the crime. Ramey told his girlfriend Stacey Johnson that he stole the murder weapons from the Nairn residence. Tr. Vol. 31 at 215.[23] Ramey confessed to Johnson that the pistols he disposed of were used in the triple homicide. Tr. Vol. 31 at 205-06. She later helped the police recover the weapons. Tr. Vol. 31 at 202-03. Ramey repeatedly told others, such as Johnson, that he was involved in the murders and how they happened. Tr. Vol. 31 at 206-07. In particular, Ramey told Johnson that he shot all three victims. Tr. Vol. 31 at 205-210. Ramey told Courtney Hardaway about the murders, but said that the victims "got shot" without identifying whether he or Norman did the shooting. Tr. Vol. 34 at 172–74. While bragging, joking, and laughing about the crime, Butler heard Ramey say that he shot Tiffany Peacock in the head. Tr. Vol. 34 at 54.

The State presented testimony that Ramey had confessed to numerous inmates. Ramey points to areas in which a trial attorney could have challenged much of that

---

[23]     Other evidence tended to corroborate the accounts. Stacy Johnson testified that she helped Ramey stash weapons, Tr. Vol. 30 at 153-54, and later helped him dispose of pistols, Tr. Vol. 30 at 158-69; Tr. Vol. 31 at 195-97. Richard Wright, the principle at Edna High School, testified that he received information indicating Ramey and Norman were involved in the murders, but a hearsay objection preventing him from offering any additional testimony. Tr. Vol. 32 at 91. The State presented Wright's testimony to show how the police came to suspect Ramey's involvement in the murders. Tr. Vol. 30 at 40

testimony, his arguments do not completely eviscerate their testimony, only create issues of credibility for jurors to resolve.

With all that evidence, Ramey has not shown prejudice had counsel performed consistent with his federal arguments, particularly given the decision jurors had to make. Counsel faced an onerous task in crafting a guilt/innocence defense. The jury instructions made that task harder. The State prosecuted Ramey both as a principal and as a party to the murders. Clerk's Record at 173. The jury found that Ramey was the principal, so it did not have to answer whether or not the evidence would have allowed for his conviction even if he had not been the shooter. Clerk's Record at 176. Still, the jury instructions allowed for his conviction if "acting with intent to promote or assist the commission of the murder or murders," he "any solicited encouraged directed aided or attempted to aid LeJames Norman" in them. Clerk's Record at 173. The State could have convicted Ramey without showing that he fired the killing shots.

With that strong evidence against his client, trial counsel rested without calling any witnesses. Ramey himself approved that decision on the record. (Dkt. No. 30, Ex. 16 at 6-7).

## D. *Martinez*

Ramey now attacks numerous elements of the trial testimony against him through the prism of habeas counsel's representation. A competent state habeas attorney could reasonably forgo extensive investigation and argument challenging the guilt/innocence testimony in favor of expending resources in more productive areas. More to the point, the avalanche of evidence against Ramey would preclude the state habeas court from granting relief had habeas counsel raised the claims alleged in the federal petition. Given the overwhelming evidence in the guilt/innocence phase, and in light of the nature of the claims Ramey contends should have been raised, Ramey has not shown that he meets the *Martinez* exception to the procedural bar doctrine. And with a broad review of the trial evidence placed in the context of Ramey's federal allegations, he has not shown actual prejudice. Claim six is procedurally barred from federal review.[24]

## VI. Trial Counsel Provided Ineffective Representation in the Penalty Phase. (Claim Seven)

Ramey argues that trial counsel provided prejudicial performance in the penalty phase. Ramey concedes that he exhausted this claim in state court, but acknowledges that his state habeas claim "did not contain the level of detail or reflect the abundant investigation conducted by" his federal attorneys. (Dkt. No. 30 at 191). The Court can only consider arguments and evidence that Ramey exhausted in state court. The Supreme

---

[24] That is not to say that the prior attorneys' efforts were perfect. A zealous state habeas attorney could have raised the Strickland claims contained in the federal petition, and possibly others. A reasonable state habeas attorney, however, could also decide not to raise them. *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). For the same reasons discussed above, the Court alternatively finds that Ramey has not shown *Strickland* deficient performance and prejudice with respect to his underlying allegations against trial counsel.

Court in *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), has made it clear that federal habeas review "focuses on what a state court knew and did." "The import of *Pinholster* is clear: because [Ramey's] claims have already been adjudicated on the merits, § 2254 limits [federal] review to the record that was before the state court." *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012).

Ramey argues that "[b]oth common sense and Fifth Circuit precedent hold that the mitigation evidence gathered for a federal habeas petition that was not presented at any lower level may be excused under the *Martinez/Trevino* standard." (Dkt. No. 49 at 130). The Fifth Circuit, however, has held that "*Martinez* does not apply to claims that were fully adjudicated on the merits by the state habeas court because those claims are, by definition, not procedurally defaulted." *Escamilla v. Stephens*, 749 F.3d 380, 394 (5th Cir. 2014); *see also Villanueva v. Stephens*, 619 F. App'x 269, 276 (5th Cir. 2015); *Allen v. Stephens*, 619 F. App'x 280, 290 (5th Cir. 2015). Once a state habeas court has denied a claim on the merits, *Martinez* "may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state habeas court." *Escamilla*, 749 F.3d at 395. Simply, "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 437 (2000). This Court, therefore, will only consider the issues Ramey exhausted in state court.

Ramey's state habeas claim focused on showing a "clear lack of preparation" in the presentation of testimony which caused "a breakdown in the adversarial process." State Habeas Record at 49. Ramey argued that his trial attorney failed to "investigate the

life of the client, uncover any and all evidence tending to counsel for life, including appropriate diagnostic testing and evaluations, and present that evidence to the jury in a clear understandable manner." State Habeas Record at 49. Ramey criticized trial counsel for "only present[ing] two witnesses," his mother and gerontological psychologist Mark Kunik. State Habeas Record at 49. Ramey particularly emphasized that trial counsel should have secured the services of a different, better-prepared punishment phase expert.

Ramey, however, did not support his allegations with any evidence. Ramey did not explain what experts counsel should have called, provide any indication of which uncalled witnesses should have testified, develop any previously undiscovered mitigating theories, verify what more witnesses could have told jurors, or otherwise substantiate his habeas claim.

The unsupported nature of Ramey's truncated claim led the state habeas court to find that he "failed to show that [a future dangerousness] expert was available in this case," "what such an expert could have presented in the case," and "that such an expert could have presented any testimony which was likely to bring about a different result." State Habeas Record at 155-56. Similarly, the state habeas court found that Ramey "fails to even suggest as to how [an] expert could have been successfully prepared to meet the successful cross-examination conducted by the prosecution." State Habeas Record at 156. The state habeas court denied relief because the "record does not affirmatively demonstrate the alleged ineffectiveness of trial counsel and this claim of ineffective assistance of counsel should be denied." State Habeas Record at 156.

Based on the information Ramey presented, the state habeas court's decision was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The defense's punishment-phase testimony and evidence was not extensive. Trial counsel called only two witnesses, Ramey's mother and Dr. Kunik. The decision to rely only on those witnesses, however, was not on the shoulders of trial counsel alone. Trial counsel said on the record that they had "discussed the witnesses at length at both the guilt-innocence phase and the mitigation phase, the punishment phase, and we also discussed the potential witnesses with the client, including his own testimony, prior to the decision of being made to call only those two witnesses." (Dkt. No. 30, Ex. 16 at 6-7). Ramey agreed with trial counsel's statement. (Dkt. No. 30, Ex. 16 at 6-7).

In state habeas court, Ramey complained about trial counsel's efforts without showing what he should have done. A habeas petitioner challenging his trial attorney's punishment investigation "must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005); *see also Greer v. Thaler*, 380 F. App'x 373, 386 (5th Cir. 2010); *Carty v. Quarterman*, 345 F. App'x 897, 903 (5th Cir. 2009). An inmate cannot only allege that his attorney should have called more or different witnesses. He "must name the [uncalled witnesses] witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). Constitutional error cannot

rest on the naked assertion that trial counsel should have done more, for "speculations as to what [uncalled] witnesses would have testified is too uncertain." *Alexander*, 775 F.2d at 602; *see also Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) ("[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative."). Because Ramey did not verify what more trial counsel could have done, the state habeas court's decision was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

The full argument Ramey makes on federal review shows that trial counsel could have done much more. The strictures of federal review, however, preclude federal consideration of information Ramey did not present to state court. AEDPA precludes relief on the claim Ramey exhausted in state court and review of any issues he did not exhaust there. The Court will deny this claim.

## VII. The Admission of Unreliable Testimony by an Expert Witness Violated Ramey's Rights. (Claim Nine)

Ramey's ninth claim argues that his Eighth Amendment rights were violated by the State's use of an expert who allegedly based his opinion on unreliable methodology. The punishment phase required the jury to answer whether "there is a probability that [Ramey] would commit criminal acts of violence that would constitute a continuing threat to society?" State Habeas Record at 193. The prosecution sought to introduce expert testimony from Dr. Richard Coons, a psychiatrist, regarding Ramey's future

dangerousness. Trial counsel requested that the trial court hold a *Daubert/Kelley*[25] hearing to examine Dr. Coons' qualifications and the methodology underlying his opinions. State Habeas Record at 178; Tr. Vol. 38 at 26-36. After questioning by the parties, the trial court allowed him to testify. Tr. Vol. 38 at 65-84.

As the State's final witness, Dr. Coons explained that he had not interviewed Ramey but based his testimony on reviewing extensive records. Tr. Vol. 38 at 71, 74. From the amount of information he reviewed, Dr. Coons felt that he could reasonably assess whether Ramey would be a future societal danger. In response to a hypothetical question, Dr. Coons testified that a person such as Ramey would "commit criminal acts of violence in the future which would constitute a continuing threat to society." Tr. Vol. 38 at 81.

Trial counsel cross-examined Dr. Coons and attempted to point out weaknesses in his testimony, particularly because he did not examine Ramey personally. Tr. Vol. 39 at 83-84.

Ramey first challenged Dr. Coons' testimony on direct appeal. Construing his arguments as attacking Dr. Coons' qualifications, the Court of Criminal Appeals held that the trial court did not err in finding him qualified as a expert witness under Rule 703 of the Texas Rules of Evidence. *See Ramey*, 2009 WL 335276 at *14-15.[26]

---

[25] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

[26] Ramey argues that "[t]he Court of Criminal Appeals of Texas construed Mr. Ramey's attack on Dr. Coons' methodology as merely an attack on Dr. Coons' qualifications, and thus did not review the trial court's assessment of Dr. Coons' methodology." [DE 30 at 193, n.57]. Ramey's appellate brief discussed various concerns about Dr. Coons' testimony. The Court of Criminal Appeals' emphasis on his qualifications, however, is understandable because Ramey argued that, "[c]utting straight to the chase, during the *Daubert* hearing the State failed to show that

Ramey also challenged Dr. Coons' testimony in his habeas application, clarifying that his habeas claim was the same "as presented in [his] direct appeal." State Habeas Record at 8, 60. The trial-level habeas court found that Dr. Coons' testimony was admissible:

> Dr. Coons held both a law degree and medical degree, served in the United States Army Medical Corp and was a consultant for Brooke Army Medical Center; was certified by the Board of Psychiatry and Neurology, trained in neurology and psychiatry and had been in private practice more than 30 years. Dr. Coons was properly qualified as an expert witness and his testimony was relevant and assisted the trier of fact to determine the issue of [Ramey's] future dangerousness.

State Habeas Record at 160.[27]

During the pendency of Ramey's habeas action, the Court of Criminal Appeals issued *Coble v. State*, 330 S.W.3d 253, 270 (Tex. Crim. App. 2010), which concluded that the State had not shown the scientific reliability of Dr. Coons' testimony under Texas Rule of Evidence 702. *Coble*, however, found that Dr. Coons' testimony did not violate the Eighth Amendment's heightened reliability standard and was not harmful. *Coble*, 330 S.W.3d at 270, 287. Because the *Coble* case questioned the state-law basis for admitting Dr. Coons' testimony, the Court of Criminal Appeals set Ramey's case for submission and ordered additional briefing. *Ex parte Ramey*, 2011 WL 1288284 at *1. Ultimately, the Court of Criminal Appeals held that (1) Ramey's state-law challenge to Dr. Coons' testimony was not cognizable on habeas review and (2) his testimony did not

---

Dr. Coons was qualified to give an opinion as to the future dangerousness of the Defendant" Brief of Appellant at 20

[27] Additionally, the trial-level habeas court observed: "These contentions were raised on direct appeal by [Ramey] and found to be without merit by the Court of Criminal Appeals. This court adopts the findings and conclusions of the Court of Criminal Appeals on these issues." State Habeas Record at 160.

violate the heightened reliability requirement of the Eighth Amendment. *See Ex parte Ramey*, 382 S.W.3d 396, 397 (Tex. Crim. App 2012).

Ramey renews his federal and state law challenges to Dr. Coons' testimony on federal review. Ramey first contends that Dr. Coons' testimony was unreliable, and thus inadmissible, under Rule 702 of the Texas Rules of Evidence because his methodology was "not in line with the state of the art of his field," "completely subjective and unsubstantiated by reference to any source other than [Dr. Coons'] own conclusory statements," and without information about the "error rate of his predictions." (Dkt. No. 30 at 199). Federal courts, however, do "not sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998). "A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious that it renders the petitioner's trial fundamentally unfair." *Kittelson v. Dretke*, 426 F.3d 306, 320 (5th Cir. 2005) (quotation omitted). The Fifth Circuit has found that Dr. Coons' testimony in a similar case was sufficiently reliable for presentation in federal court, *see United States v. Fields*, 483 F.3d 313, 345 (5th Cir. 2007), suggesting that the state court's admission of his testimony was not so egregious that his trial was unfair.

Ramey also argues that psychiatric evidence of future dangerousness does not meet *Daubert*'s standards for admissibility, thus violating the Eighth Amendment's heightened reliability requirement in capital cases. In rejecting this claim, the Court of Criminal Appeals relied on *Barefoot v. Estelle*, 463 U.S. 880 (1983), a case in which the

Supreme Court refused to prohibit categorically all psychological predictions of future dangerousness from capital sentencing proceedings. The *Barefoot* court specified:

> The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel. In the first place, it is contrary to our cases. If the likelihood of a defendant committing further crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950, 49 L.Ed. 2d 929 (1976), and if it is not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.

*Id* at 899.

The Fifth Circuit has repeatedly relied on *Barefoot* to approve the admissibility of future dangerousness testimony similar to that given by Dr. Coons. *See Roberts v. Thaler*, 681 F.3d 597, 608-09 (5th Cir. 2012); *Fields*, 483 F.3d at 343-45. In particular, the Fifth Circuit has "consistently held that *Daubert* did not overrule *Barefoot* for the proposition that expert testimony regarding future dangerousness is permissible . . ." *Gonzales v. Stephens*, 606 F. App'x 767, 774 (5th Cir. 2015); *see also Holiday v. Stephens*, 587 F. App'x 767, 783 (5th Cir. 2014); *Johnson v. Cockrell*, 306 F.3d 249, 253-55 (5th Cir. 2002). In fact, the Fifth Circuit has held that "*Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing." *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014). The Fifth Circuit has found that similar challenges to Dr. Coons' testimony "present[] no cognizable Eighth Amendment claim." *Coble v. Davis*, ___ F. App'x ___, 2018 WL 1611434, at *3 (5th

Cir. 2018).  With that legal precedent, Ramey has not shown constitutional error in the admission of Dr. Coons' testimony.

Ramey has not shown that the state court's decision regarding this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## VIII.  Alternative Review of Claims Five, Eight, Ten, and Eleven

Ramey did not raise claims five, eight, ten and eleven in a timely manner and he does not merit equitable tolling.  Even if Ramey had timely filed those claims, the unexhausted nature of the untimely claims adds a second layer of procedural hurdles to federal adjudication.  Federal review only becomes available after a showing of cause and actual prejudice.

### A.      Exhaustion of Claims Eight, Ten, and Eleven

Claims eight, ten, and eleven challenge the representation provided by Ramey's prior attorneys.  Claim eleven is not a ground for relief, but rather argues that ineffective assistance of prior attorneys acts as cause to forgive any default.  The Court, therefore, summarily denies claim eleven.

Claim eight argues that the cumulative effect of his attorneys' errors violated Ramey's rights and claim ten argues that appellate counsel provided ineffective representation by not raising any unexhausted claims.  To overcome the procedural bar of those claims, Ramey relies on the ineffective assistance of his prior attorneys under *Martinez*.  The Supreme Court, however, has held that *Martinez* only allows review of ineffective-assistance-of-trial-counsel claims.  *See Davila v. Davis*, __ U.S. __, 137 S. Ct. 2058, 2070 (2017).  *Martinez* only applies to the portion of claim eight arguing

cumulative error from trial counsel's efforts. This Court, however, has considered Ramey's arguments about trial counsel's representation and found no error to cumulate. Ramey, therefore, has not shown that state habeas counsel missed a meritorious, and potentially successful, habeas claim by not raising cumulative error. Ramey has not overcome the procedural bar of claims eight, ten, and eleven.

**B.     Exhaustion of Claim Five**

Claim five argues that the State used Otis Santellana to elicited information from Ramey in violation of *Massiah v. United States*, 377 U.S. 201 (1964). Ramey argues that he could not discover this claim before federal review because the State violated *Brady* by suppressing its factual basis. A *Brady* violation may establish cause to excuse procedural default. *See Banks v. Dretke*, 540 U.S. 558, 691 (2004); *Strickler v. Greene*, 527 U.S. 263 (1999).

As discussed previously, Ramey does not present any competent evidence that Santellana was a state actor sent to secure testimony from him. Further, Ramey has not shown that he could not have secured during state habeas review the same unconvincing evidence on which he bases his federal habeas claim. Also, as the Court discussed previously, any impropriety in Santellana's testimony is not material in light of the significant – and overwhelming – testimony of others to whom Ramey confessed his involvement in the crime. The Court finds that Ramey has not overcome the procedural bar of claim five. Additionally, even if the full merits of claim five were before the Court, Ramey does not provide competent evidence that shows that a material constitutional error deprived him of a fair trial.

###     C.     Conclusion

Ramey has not shown that he can overcome the procedural bar of his time-barred claims or that they merit federal habeas relief.  The Court would deny relief if claims five, eight, ten, and eleven were fully available for judicial review.

## CERTIFICATE OF APPEALABILITY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Ramey has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  The Fifth Circuit anticipates that a court will resolve any questions about a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

 The Supreme Court has explained the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El I*, 537 U.S. at 336-38.  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a

valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484; *Miller-El I*, 537 U.S. at 336-38. Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Ramey's petition raises issues worthy of judicial review. Nevertheless, having considered the merits of Ramey's petition, and in light of AEDPA's standards and controlling precedent, this Court determines that a COA should not issue on any claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Respondent's motion for summary judgment (Dkt. No. 40) and **DENIES** Petitioner Ker'sean Olajuwa Ramey's Petition for Writ of Habeas Corpus (Dkt. No. 7) **WITH PREJUDICE**. All outstanding motions are otherwise **DENIED**. A Certificate of Appealability is **DENIED** with respect to all claims.

It is so ORDERED.

SIGNED on this 9th day of July, 2018.

Kenneth M. Hoyt
United States District Judge